Sophia M. Rios (Bar No. 305801)
BERGER MONTAGUE PC
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Tel: (619) 489-0300
srios@bm.net

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY LOUGHRAN, ROSEMARY ORLANDO, and EDWARD CARR, Individually and on behalf of all others similarly situated,<br><br>                       Plaintiffs,<br><br>    v.<br><br>THE CHARLES SCHWAB CORPORATION and CHARLES SCHWAB & CO., INC.,<br><br>                       Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. INTRODUCTION ................................................................................ 1

II. JURISDICTION AND VENUE ......................................................... 3

III. PARTIES .......................................................................................... 4

    A. Plaintiffs ................................................................................. 4

    B. Defendants .............................................................................. 5

IV. FACTUAL BACKGROUND............................................................ 5

    A. Defendants' Customer Relationship ...................................... 5

    B. The Bank Sweep Program....................................................... 6

    C. CS&Co Acted as a "Double Agent" Regarding the
       Bank Sweep Program .............................................................. 7

    D. The Bank Sweep Program Benefits Defendants and Its Program
       Banks, Not Its Customers........................................................ 8

    E. Defendants' Disclosures to Its Customers Regarding
       the Bank Sweep Program Contained Material
       Misrepresentations and Omissions......................................... 9

V. CLASS ACTION ALLEGATIONS................................................. 12

    A. Numerosity - Rule 23(a)(1) ................................................. 13

    B. Existence and Predominance of Common Questions
       of Law and Fact - Rule 23(a)(2), 23(b)(3) .......................... 13

    C. Typicality - Rule 23(a)(3) .................................................... 14

    D. Adequacy of Representation - Rule 23(a)(4) ...................... 14

    E. Superiority - Rule 23(b)(3).................................................. 14

VI. CAUSES OF ACTION.................................................................... 16

FIRST CAUSE OF ACTION
BREACH OF FIDUCIARY DUTY (Asserted on behalf
of the Plaintiffs and the Class against Defendants) .......................................... 16

SECOND CAUSE OF ACTION
GROSS NEGLIGENCE (Asserted on behalf of the Plaintiffs
and the Class against Defendants) ..................................................................... 17

THIRD CAUSE OF ACTION
UNJUST ENRICHMENT (IN THE ALTERNATIVE)
(Asserted on behalf of the Plaintiffs and the Class against Defendants)......... 19

FOURTH CAUSE OF ACTION
UNFAIR OR FRAUDULENT BUSINESS PRACTICES IN
VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW,
CAL. BUS. & PROF. CODE §§ 17200 ET SEQ. ............................................. 19

VII.    PRAYER FOR RELIEF ............................................................................... 21

VIII.   DEMAND FOR JURY TRIAL .................................................................... 22

ii

Plaintiffs Mary Loughran, Rosemary Orlando, and Edward Carr ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action as a class action against defendants The Charles Schwab Corporation ("Charles Schwab") and its wholly-owned broker-dealer subsidiary Charles Schwab & Co., Inc. ("CS&Co") (collectively "Defendants"). Plaintiffs and the members of the proposed class were at all relevant times customers of Defendants, a diversified financial services firm, whose cash held in its customers' brokerage accounts was subject to Defendants' bank sweep program, as described below. Plaintiffs allege as follows against Defendants, based on personal knowledge as to Plaintiffs and their own acts, and otherwise on information and belief, based on the investigations of their counsel, which included a review of documents created and distributed by Defendants, filings with the U.S. Securities and Exchange Commission ("SEC"), filings with the Federal Deposit Insurance Corporation ("FDIC"), and other publicly available commentary, analysis, and information. Upon information and belief, Plaintiffs believe that discovery will further support the allegations in this class action complaint.

# I.   INTRODUCTION

1.     This case arises out of a cash sweep program implemented by Defendants whereby, acting as its customers' agent and fiduciary, defendant CS&Co automatically "sweeps" uninvested cash balances in its customers' accounts and deposits that cash into deposit accounts at one of its Affiliated Banks, and starting in 2022 two additional banks presumably as a result of Defendants'

acquisition of TD Ameritrade Holding Corporation in 2020 (the "Bank Sweep Program" or "Program").[1]

2.     Defendants implemented the Program ostensibly to offer CS&Co's customers an interest paying vehicle to hold cash that offers FDIC insurance on those cash deposits, but in fact, Defendants designed and operated the Program to obtain outsized benefits for themselves from its customers' cash.

3.     CS&Co specifically acknowledges to its customers that it acts as their "agent" and thus their fiduciary "in establishing," maintaining, and operating the Program . Under this broad scope of the agency, Defendants exercised their discretion in selecting: (i) the bank(s) to participate in the Program; (ii) the type of accounts to which the Program applies, and (iii) the type of bank accounts in which the CS&Co customers' funds are swept. CS&Co, while acting as its customers' fiduciary, also determines the interest rates paid to its customers under the Program and further decides the amount of compensation to be paid to CS&Co. Defendants' actions in designing, implementing, and operating the Program to benefit itself at the expense of its customers constitutes a breach of the fiduciary duties that CS&Co owes to its customers.

4.     While acting as its customers' agent, Defendant CS&Co used the Program to confer significant benefits upon itself and its affiliates by: (1) taking for itself and its affiliates the vast majority of the compensation earned from its customers' cash at the expense of its customers and principals, who received only a minimal return on their cash deposits; and (2) concealing the benefits Defendants

---

[1] The Program at issue in this case does not include any cash sweep investments in money market funds. The "Affiliated Banks" are wholly owned subsidiaries of The Charles Schwab Corporation, including Charles Schwab Bank, SSB ("Charles Schwab Bank"); Charles Schwab Premier Bank, SSB; Charles Schwab Trust Bank. The additional banks added to the Program are TD Bank, N.A. ("TD Bank") and TD Bank USA, NA ("TD Bank USA"). The Affiliated Banks and additional banks are referred to herein as the "Program Banks."

and its affiliates received from CS&Co's principals' cash by making inaccurate, misleading, or oblique disclosures.

5.     CS&Co also failed to adequately, if at all, disclose to its customers that it was an agent serving two masters – those being its customers on one hand, and its affiliated companies, including the Affiliated Banks, on the other hand. Suffering from this conflict, Defendants shortchanged their customers for the benefit of themselves and their affiliates by negotiating with its Affiliated Banks one-sided transactions related to the Program. The Program terms shifted compensation and returns on its customers' cash in the Program from those customers to Defendants or their affiliates. Indeed, while acting as its customers' fiduciary agent vis-à-vis the establishment, maintenance, and operation of the Program, CS&Co negotiated transactions whereby it shifted the compensation that broker-dealers like CS&Co customarily receive from banks in connection with cash sweep Programs to the Program Banks, instead of to its customers, to whom it owed fiduciary duties. Moreover, CS&Co failed to disclose these manifestly conflicted transactions, much less obtain informed consent from its customers and principals.

6.     Lastly, Defendants violated their duties to charge reasonable fees on the Program as required under the applicable industry standards.

7.     Plaintiffs bring this action individually and on behalf of a Class of similarly situated individuals for breach of fiduciary duty, gross negligence, unjust enrichment, and violations of the California Unfair Competition Law to recover damages arising out of Defendants' violations of the law, and for such other relief as the Court may deem just and proper.

## II.    JURISDICTION AND VENUE

8.     This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(d)(2), as this action is brought as a class action on

behalf of class members, one or more members of the class are citizens of a state different than the Defendants, and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

9.     The Court has personal jurisdiction over Defendants because defendant CS&Co is a California corporation with a registered corporate agent in this District at 330 N. Brand Boulevard, Glendale, CA, regularly transacts business in this District including through its affiliates, and thus has minimum contacts in California and in this District.

10.     Venue is proper under 28 U.S.C. § 1391 because, among other things, Defendants have offices in this District, and a substantial part of the events, omissions, and/or relevant conduct by Defendants giving rise to Plaintiffs' claims occurred in this District.

## III.    PARTIES

### A.    Plaintiffs

11.     Plaintiff Mary Loughran was at all relevant times a customer of Defendants and is a resident and citizen of the State of Colorado. She maintained an account with CS&Co in which cash was held over the course of the life of the account. While she was Defendants' customer, the cash held in her account was automatically "swept" into interest-bearing bank accounts at Program Banks pursuant to the Program.

12.     Plaintiff Rosemary Orlando was at all relevant times a customer of Defendants and is a resident and citizen of the State of Ohio. She maintained an account with CS&Co in which cash was held over the course of the life of the account. While she was Defendants' customer, the cash held in her account was automatically "swept" into interest-bearing bank accounts at Program Banks pursuant to the Program.

13.    Plaintiff Edward Carr was at all relevant times a customer of Defendants and is a resident and citizen of the Commonwealth of Pennsylvania. He maintained an account with CS&Co in which cash was held over the course of the life of the account. While he was Defendants' customer, the cash held in his account was automatically "swept" into interest-bearing bank accounts at Program Banks pursuant to the Program.

### B.    Defendants

14.    Defendant The Charles Schwab Corporation ("Charles Schwab") is a financial services firm based in the U.S. with operations worldwide. Charles Schwab is a holding company that conducts business through its subsidiaries including Defendant CS&Co, and non-party Charles Schwab Bank. Charles Schwab is a Delaware corporation with its headquarters at 3000 Schwab Way, Westlake, TX 76262.

15.    Defendant Charles Schwab & Co., Inc. ("CS&Co") is a California corporation with a registered corporate agent in this District at 330 N. Brand Boulevard, Glendale, CA. CS&Co is a full-service broker-dealer and investment advisor registered with the SEC. CS&Co is a wholly-owned subsidiary of defendant Charles Schwab.

## IV.    FACTUAL BACKGROUND

### A.    Defendants' Customer Relationship

16.    The relationship between Defendants and their customers, including Plaintiffs, was set forth in written agreements such as the Schwab One Brokerage Account agreement (the "Account Agreements"). The Account Agreements provide that the Bank Sweep Program is governed by the terms and conditions set forth in the Cash Features Disclosure Statement ("Program Agreement").

17.    By signing the Account Agreements, customers consent to participate in the Bank Sweep Program.

18.     The Program Agreement establishes a fiduciary relationship between Defendants and the proposed class, stating that "[CS&Co] is acting as your ***agent*** in establishing the Deposit Accounts" and conducting transactions in its customers' Deposit Accounts. (Emphasis added).

**B.     The Bank Sweep Program**

19.     The Bank Sweep Program is offered and operated by CS&Co. The Program Agreement sets forth how customers' uninvested cash is automatically "swept" from the customers' account into deposit accounts with Charles Schwab Bank and other Program Banks.

20.     According to the Account Agreements, acting as its customers' agent, CS&Co will establish two deposit accounts for its customers at the Program Banks; a demand deposit account ("DDA"), and a money market deposit account ("MMDA")[2]. Due to limits on the number of monthly transactions permitted in MMDA bank accounts under federal regulations, CS&Co will, in its discretion, make deposits in and withdrawals from those accounts, determine what balances to keep in each account, and move money between those bank accounts on its customers' behalf as it deems fit.

21.     According to the Account Agreement, the interest rate on the Bank Sweep Program is set by the Program Banks "at a rate as low as possible, consistent with their views of prevailing market and business conditions." Prior to adding the additional Program Banks, the Program Agreement provided: "[i]nterest rates are set at the discretion of the Affiliated Banks."

---

[2] A money market deposit account is a type of bank account and bears no relation to a money market fund.

**C.    CS&Co Acted as a "Double Agent" Regarding the Bank Sweep Program**

22.    Pursuant to the Program Agreement, CS&Co acted as its customers' agent and exercised discretion in the operation of the Bank Sweep Program.

23.    The Program Agreement specifically provided that:

- "*[CS&Co] is acting as your agent* in establishing the Deposit Accounts with the Affiliated Bank and in depositing and withdrawing funds." (Emphasis added).

- "When funds in your Account are first available for deposit into Deposit Accounts at an Affiliated Bank, [CS&Co], *as your agent*, will open a DDA and an MMDA on your behalf at the Affiliated Bank and deposit your [uninvested cash] in them." (Emphasis added).

- "*As your agent*, we will make all withdrawals necessary to satisfy debits in your Account." (Emphasis added).

24.    Further, in account statements distributed to their customers, Defendants state:

> Schwab acts as your agent and custodian in establishing and maintaining your Bank Sweep and Bank Sweep for Benefits Plans features as a Schwab Cash Feature for your brokerage account.

25.    Thus, in light of the express terms of the Program Agreement, CS&Co was duty-bound to establish and maintain the Program in the best interests of its principals, i.e., its customers such as Plaintiffs and the members of the proposed Class. Notwithstanding, CS&Co established, maintained, and operated the Program for its own interests, contrary to the interests of its customers.

26.    Given the discretion that Defendants exercise over the Program in light of, among other things, the Program Agreement, CS&Co should have exercised its discretion to benefit its customers, whose agent it was as to the Program, but instead did so to benefit itself and its affiliates. At the same time CS&Co was acting as its customers' agent in connection with the Program, it was also beholden to its Affiliated Banks.

**D.    The Bank Sweep Program Benefits Defendants and Its Program Banks, Not Its Customers**

27.    In contravention of the applicable agreements and their fiduciary obligations, the Bank Sweep Program primarily benefited Defendants and their Program Banks, including their Affiliated Banks at the expense of their customers.

28.    The Program Agreement explains that "[t]he Affiliated Banks will use the cash balances in the Deposit Accounts to fund current and new lending activities and investments." The Program Agreement also generally refers to the "spread" that the Affiliated Banks will be able to profit from on these lending activities and investments.

29.    According to the Program Agreement, deposits from the Program will "provide a stable source of funds for the Affiliated Banks' [and additional Program Banks] lending and investment activities." Additionally, "[t]he cash balances can also be used to provide funds to develop products and services for Schwab-affiliated companies".

30.    In addition, CS&Co also profits from the Program by providing services to the Affiliated Banks. Specifically, the Program Agreement discloses the following:

> The Affiliated Banks pay [CS&Co] an annual per account flat fee for these administrative services…We and certain of our affiliates also provide operational, technology, and other services to the Affiliated Banks and receive compensation for those services. In addition, certain of our employees and registered representatives can be compensated in part, based directly or indirectly, on deposit balances in the Bank Sweep and Bank Sweep for Benefit Plans features or the profitability of the features for the Affiliated Banks and our joint parent company.

31.    As its customers' agent, CS&Co exercises discretion as to the Program's key features, including negotiating and establishing the rates of returns

for its customers. CS&Co exercised this discretion in a manner that pays unreasonably low interest rates to its customers in the Program. CS&Co also shifts to its Affiliated Banks and additional Program Banks, a substantial portion of the beneficial returns on its customers' cash.

32.    CS&Co is a fiduciary of its customers in the Program, and in that capacity was required to put their customers' interests first – not the interests of Defendants and the Program Banks. Instead, CS&Co's customers received unreasonably low interest rates under the Program.

### E.    Defendants' Disclosures to Its Customers Regarding the Bank Sweep Program Contained Material Misrepresentations and Omissions

33.    CS&Co's disclosures contained a multitude of material misrepresentations and omissions that inaccurately presented the terms and operation of the Program to Plaintiffs and members of the proposed Class, and thus prevented them from giving informed consent as to the Program and Defendants' conflicts of interests. For example, pursuant to the Program Agreement, "[t]he interest rates paid on the Deposit Accounts can be higher or lower than the interest rates available … to depositors making deposits directly with an Affiliated Bank [or Program Banks] or other depository institutions in comparable accounts." This statement is false and misleading because, as Defendants knew at the time, the interest rate received by customers in the Program would be lower than the interest rates available to depositors making deposits directly with a Program Bank.

34.    The Program Agreement states that "[i]nterest rates are set at the Affiliated Banks' discretion". This is misleading because it omits Defendants' role in the process and Defendants' ability to influence the interest rates that the Affiliated Banks set.

35.    Additionally, CS&Co's disclosures in the Program Agreement are insufficient regarding the "'spread,' between the interest rate paid on the Deposit

Accounts and other costs of maintaining the Deposit Accounts, and the interest rate and other income earned by an Affiliated Bank on the loans and investments made with the funds in the Deposit Accounts." Similarly, the Program Agreement vaguely discloses the "profitability" that Program Banks "will have the opportunity to earn" from the Program comparing what CS&Co might earn to what the Affiliated Banks might earn and not to what its customers might earn: "[t]he income that the Affiliated Banks will have the opportunity to earn through their lending and investing activities is expected to be greater than the fees earned by Schwab and its affiliates from managing and distributing the Schwab Sweep Money Funds." These vague and misleading disclosures do not provide the customer with any insight into the size of the spread or how that impacts the Program's interest rates. More specifically, unlike in an arm's length relationship with a third party bank that is simply a borrower of its depositor's money, the customers here had a fiduciary relationship with Defendants, who acted as their agents in negotiating and structuring cash sweep-related deals with the Program Banks, but shifted to those banks a portion of the compensation – in an amount that is unknown here – that broker-dealers like CS&Co typically receive from banks for directing customer cash sweeps to such banks. Thus, the "spread" referenced by the Program Agreement included not just a typical bank spread but also compensation – in an unknown amount – that CS&Co would have been customarily entitled to receive but which it chose to forego in favor of the Program Banks and not in favor of its customers, whose fiduciary agent it was as to the Program. The amount of the benefit conferred by the customers' agents, Defendants, to the customers' counterparties the Program Banks, and indeed the existence of such benefit, were material facts that should have been disclosed by Defendants to their customers. In fact, the Program Agreement is entirely silent about what CS&Co and its affiliates will earn vis-à-vis its fiduciary customers.

36.    Notably, Defendants fail to disclose in the Program Agreement the interest rates that the Program offers, instead only including a link to its website.

37.    There is also no disclosure in the Program Agreement as to the amount that the Affiliated Banks pay CS&Co, instead claiming that the customer can make a written request to obtain "[i]nformation regarding the fee and other compensation [CS&Co] currently receive[s] from the Affiliated Banks for these administrative, operational, technology, and other services."

38.    Unbeknownst to Defendants' customers in the Program, their agent, CS&Co, enabled the Affiliated Banks to function as highly profitable arbitrage operations as to the CS&Co customers' cash in the Program, taking advantage of the nearly free cash funneled to them by CS&Co as agent of its customers pursuant to the Program, and retaining for themselves the vast majority of the profits they generate with that cash.

39.    Additionally, Defendants' disclosures omit the fact that that CS&Co negotiated and entered into transactions regarding the Program that directly impacted Plaintiffs and the proposed Class, and did so while conflicted, putting its interests and the interests of its Affiliated Banks before the interests of its customers. Defendants' disclosures further omit that CS&Co foregoes substantial compensation in connection with the Program so as to benefit its Affiliated Banks, instead of its customers to whom Defendants owed a fiduciary duty in connection with the Program.

40.    Finally, Defendants omitted critical disclosures regarding their contractual obligations vis-à-vis the Program to the non-affiliated Program Banks, TD Bank and TD Bank USA, pursuant to an agreement reached with TD Bank and TD Bank USA in 2020, in connection with Defendants' 2020 acquisition of TD Ameritrade Holding Corporation from TD Bank Group. Specifically, in 2020, unbeknownst to their customers, Defendants – while acting as their customers'

agents with regard to the Program – entered into an agreement with TD Bank and TD Bank USA pursuant to which Defendants committed to direct and maintain a minimum amount at least $50 billion of cash swept from their customers' accounts to TD Bank and TD Bank USA, in exchange for substantial benefits to Defendants, through June 2031. The substantial financial benefits conferred to TD Bank Group pursuant to this agreement involving Defendants' customers' cash were part of the consideration that Defendants agreed to pay for their acquisition of TD Ameritrade Holding Corporation from TD Bank Group. In essence, unbeknownst to their fiduciary customers whose agents Defendants were at the time, Defendants used a substantial portion of their customers' cash to help pay the price of Defendants' acquisition of TD Ameritrade Holding Corporation, in breach of their fiduciary duties.

41.    Defendants only disclosed to their Program customers for the first time the existence of their agreement with TD Bank and TD Bank USA in the 2024 Program Agreement, but even then they failed to disclose to their fiduciary clients the reason for the agreement, the amount of the benefits conferred to TD Bank and TD Bank USA pursuant to the agreement, and the fact that Defendants used their fiduciary customers' money for Defendants' own benefit.

## V.    CLASS ACTION ALLEGATIONS

42.    Plaintiffs reallege and incorporate by reference the allegations set forth above.

43.    Plaintiffs bring this action individually and as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class consisting of: All persons who held cash positions in accounts custodied by Defendants, and whose cash was subject to Defendants' Program.

44.    Excluded from the Class are governmental entities, institutional and other non-retail investors; Defendants and any of its affiliates, legal

representatives, employs, or officers; the judicial officer(s) and any judicial staff overseeing this litigation; and counsel for Plaintiffs and the proposed Class, including other attorneys and staff at each respective firm.

45.    Plaintiffs reserve the right to amend the Class definitions if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

46.    This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

### A.    Numerosity - Rule 23(a)(1)

47.    Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this time. However, Defendants oversee approximately $7 trillion in client assets through the work of more than 13,000 financial advisors, and Plaintiffs believe that the members of the proposed Class number in the thousands. Accordingly, Plaintiffs and the Class satisfy the numerosity requirement of Rule 23. Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

### B.    Existence and Predominance of Common Questions of Law and Fact - Rule 23(a)(2), 23(b)(3)

48.    Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following, whether:

a.    Defendants owed fiduciary duties to Plaintiffs and the putative Class members in connection with the Program;

b.    Defendants breached their duties to Plaintiffs and the putative Class members in establishing, maintaining, and/or operating the Program;

c.      Defendants' disclosures about the Program contained material misrepresentations or omissions;

d.      Defendants breached their contract with Plaintiffs and the putative Class members regarding the Program;

e.      Defendants were unjustly enriched by their wrongful conduct;

f.      this case may be maintained as a class action under Fed. R. Civ. P. 23;

g.      and to what extent Class members are entitled to damages and other monetary relief; and

h.      and to what extent Class members are entitled to attorneys' fees and costs.

**C.**      **Typicality - Rule 23(a)(3)**

49.      Plaintiffs' claims are typical of the claims of the Class because they were customers of Defendants that had their cash balances improperly managed by CS&Co through its administration of the Program. Thus, Plaintiffs' claims are typical of the claims of the members of the Class as the claims arise from the same course of conduct by Defendants, and the relief sought within the Class is common to the members of each.

**D.**      **Adequacy of Representation - Rule 23(a)(4)**

50.      Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

**E.**      **Superiority - Rule 23(b)(3)**

51.      A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against

Defendants. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

52.    Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

53.    Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a.    the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

b.    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

# VI.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY
**(Asserted on behalf of the Plaintiffs and the Class against Defendants)**

54.    Plaintiffs reallege and incorporate by reference the preceding factual allegations as if fully set forth herein.

55.    At all relevant times, Defendants owed fiduciary duties to Plaintiffs and the members of the Class in connection with the Program. Such duties independently arose out of (1) the agency relationship between defendant CS&Co, on one hand, and Plaintiffs and the members of the Class on the other hand, as to the Program; (2) Defendants holding and control over beneficial funds that belonged to its customers, related to their cash sweep balances; (3) Defendants' discretion as to the Program and their customers' cash, while acting as their agent; and/or (4) the applicable industry standards. As a fiduciary to Plaintiffs and the Class, Defendants owed them the highest duties of loyalty, candor, due care, and prudence in as to the services they provided to them in connection with establishing, maintaining, and/or operating the Program. Moreover, as a fiduciary, Defendants had a continuing duty to act exclusively for the benefit of Plaintiffs and the Class in connection with establishing, maintaining, and/or operating the Program. Lastly, as a fiduciary, Defendants had a continuing duty to obtain informed consent from Plaintiffs and the Class regarding the Program, and specifically make sufficiently detailed disclosures regarding the Program, their role, the role of various related parties, and any conflicts of interest to obtain such informed consent.

56.    Defendants further owed Plaintiffs and the Class the fiduciary duty to act in good faith in connection with establishing, maintaining, and/or operating the Program.

57.     Defendants further owed Plaintiffs and the Class the duty to charge reasonable fees for their services related to the Program.

58.     Plaintiffs and the Class were fully dependent upon Defendants' ability, skill, knowledge, and goodwill with respect to Defendants' Program.

59.     Defendants owed Plaintiffs and the Class similar duties by virtue of their control over Defendants' policies or management regarding the Program.

60.     Defendants breached their fiduciary duties by the conduct alleged herein, including by designing, structuring, and/or operating the Program to benefit themselves at the expense of their fiduciary customers, making material misrepresentations and omissions regarding the Program, violating its duty of care, and acting in their own – not their customers' – best interest vis-à-vis the Program.

61.     Defendants violated their duty of loyalty by, among other things, putting their interest above that of their fiduciary customers, failing to provide sufficient information to their fiduciary customers regarding material features of the Program to obtain informed consent from them, and not properly disclosing their own and their affiliates' role in, and conflicts of interest arising out of the Program, as more fully shown above.

62.     As a direct and proximate consequence of Defendants' conduct as alleged herein, Plaintiffs and the Class suffered damages in an amount to be determined at trial and seek disgorgement of any undue and unjust gains of Defendants, as well as all other equitable relief deemed just and proper.

## SECOND CAUSE OF ACTION

### GROSS NEGLIGENCE
**(Asserted on behalf of the Plaintiffs and the Class against Defendants)**

63.     Plaintiffs reallege and incorporate by reference the preceding factual allegations as if fully set forth herein.

COMPLAINT
Case No.

64.    Defendants owed Plaintiffs and the putative Class, all of whom were their fiduciary customers vis-à-vis the Program, certain duties related to its establishment, maintenance, and operation of the Program.

65.    Those duties arose out of (1) the agency relationship between Defendant CS&Co, on one hand, and Plaintiffs and the members of the Class on the other hand, as to the Program; (2) Defendants' holding and control over beneficial funds that belonged to their customers, related to their cash sweep balances; and (3) the applicable industry standards.

66.    Defendants' duties to their customers included establishing, maintaining, and/or operating the Program for the benefit of their customers, not for its own benefit. Moreover, Defendants had a duty to make sufficient disclosures to their customers regarding the Program as needed for those customers to give informed consent regarding the Program.

67.    Defendants owed Plaintiffs and the Class similar duties by virtue of their control over Defendants' policies or management with regard to the Program.

68.    Defendants breached their duties by the conduct alleged herein, including by designing, structuring, and/or conducting transactions related to the Program to benefit themselves at the expense of their customers, making material misrepresentations and omissions regarding the Program, violating their duty of care, acting in their own – not their customers' – best interest vis-à-vis the Program.

69.    Defendants were not merely negligent; as more fully shown above, they were grossly negligent because their self-serving conduct showed the want of even scant care and/or was an extreme departure from the ordinary standard of conduct.

70.    Defendants' gross negligence directly and proximately caused harm to Plaintiffs and the members of the proposed Class.

### THIRD CAUSE OF ACTION

**UNJUST ENRICHMENT (IN THE ALTERNATIVE)**
**(Asserted on behalf of the Plaintiffs and the Class against Defendants)**

71.    Plaintiffs reallege and incorporate by reference the preceding factual allegations as if fully set forth herein.

72.    In the alternative, Defendants have received and retained a benefit from Plaintiffs and the members of the proposed Class, and inequity has resulted.

73.    Defendants benefited through their unjust conduct by sweeping available cash balances from their customers' accounts in the Program into bank accounts selected for the benefits they offered to Defendants, not their customers, and retained most of the interest generated by those cash balances.

74.    Plaintiffs allege that it is inequitable for Defendants to retain these benefits.

75.    Plaintiffs allege that because of Defendants' conduct, the amount of their unjust enrichment should be disgorged in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION

**UNFAIR OR FRAUDULENT BUSINESS PRACTICES**
**IN VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.**
**(Asserted on behalf of the Plaintiffs and the Class against Defendants)**

76.    Plaintiffs reallege and incorporate by reference the preceding factual allegations as if fully set forth herein.

77.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unfair or fraudulent business act or practice."

78.    The acts and practices of Defendants as alleged herein constitute "unfair" business acts and practices under the UCL in that Defendants' conduct is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous.

79.    Plaintiffs allege that Defendants have, in the course of their business and the course of trade or commerce, undertaken and engaged in unfair business acts and practices under the UCL by, among other things, using their Program to generate significant revenue for itself with their customers' money, while paying their customers only a small fraction of those returns and concealing from such customers the amounts of those customers' returns that Defendants retained for themselves and the fact that those amounts represented the vast majority of such returns.

80.    These acts also constitute "fraudulent" business acts and practices under the UCL in that Defendants' conduct is false and has a tendency to deceive the general public.

81.    The unfair business acts or practices described herein presented a threat and likelihood of harm and deception to Plaintiffs and the Class in that Defendants have systematically perpetrated the unfair conduct upon members of the public by engaging in the conduct described herein.

82.    Because of their reliance on Defendants' misrepresentations and omissions of material facts concerning the Programs, Plaintiffs and the Class have suffered an ascertainable loss of money, property, and/or value and were harmed and suffered actual damages.

83.    Defendants owed Plaintiffs and the Class a duty to disclose the true information concerning the Programs and to not withhold material facts from Plaintiffs and the Class that contradicted its representations.

84.    Had Plaintiffs and the Class been aware of the Defendants' conduct with respect to their customer cash in the Programs, Plaintiffs and the Class would not have participated in those investment products or would have done so on different terms.

85.   The gravity of harm resulting from Defendants' unfair conduct outweighs any potential utility.

86.   The harm from Defendants' conduct was not reasonably avoidable by Plaintiffs and the Class because only Defendants was aware of the true facts concerning the Programs, and Defendants did not disclose these facts, or did not sufficiently disclose them.

87.   Plaintiffs and the Class have suffered injury in fact and have lost money as a direct and proximate result of Defendants' business acts or practices. Monies lost by Plaintiffs include, without limitation, the returns on cash positions from the Programs that Defendants improperly earned from Plaintiffs' money as set forth above.

88.   Through its unfair conduct, Defendant acquired money that Plaintiffs and the Class was entitled to.

89.   Under the UCL, Plaintiffs may enjoin these acts and practices and obtain restitution of all funds retained by Defendant by reason of and through the use of these acts and practices.

90.   Plaintiffs and the Class accordingly seek appropriate relief under the UCL, including (a) in the alternative, restitution in full and disgorgement of all profits relating to the above-described unfair business acts or practices, and (b) such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair practices.

91.   Plaintiffs and the Class also seek reasonable attorneys' fees and costs under applicable law, including California Code of Civil Procedure section 1021.5.

## VII.   PRAYER FOR RELIEF

Plaintiffs request relief as follows:

1.   Actual damages;

2.   Punitive damages;

3. Injunctive relief prohibiting Defendants from continuing to engage in the conduct alleged herein;

4. Attorneys' fees and costs of suit;

5. Prejudgment interest; and

6. Such other relief as the Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable.

DATED: August 28, 2024          Respectfully submitted,

                                */s/ Sophia M. Rios*
                                Sophia M. Rios (Bar No. 305801)
                                BERGER MONTAGUE PC
                                8241 La Mesa Blvd., Suite A
                                La Mesa, CA 91942
                                Tel: (619) 489-0300
                                srios@bm.net

                                Michael Dell'Angelo
                                (pro hac vice forthcoming)
                                Andrew D. Abramowitz
                                (pro hac vice forthcoming)
                                BERGER MONTAGUE PC
                                1818 Market Street, Suite 3600
                                Philadelphia, PA 19103
                                Telephone: (215) 875-3000
                                mdellangelo@bm.net
                                aabramowitz@bm.net

                                Alan L. Rosca, Esq. (OH 0084100)
                                (pro hac vice forthcoming)
                                Jonathan A. Korte, Esq. (FL 126450)
                                (pro hac vice forthcoming)
                                ROSCA SCARLATO LLC
                                2000 Auburn Dr. Suite 200
                                Beachwood, OH 44122

Telephone: (216) 946-7070
E-mail: arosca@rscounsel.law
        jkorte@rscounsel.law

Paul J. Scarlato, Esq. (PA 47155)
(pro hac vice forthcoming)
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Telephone: (216) 946-7070
E-mail: pscarlato@rscounsel.law

*Counsel for Plaintiffs and the Proposed Class*

COMPLAINT
Case No.