**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3481

*Counsel for Consolidated Plaintiffs Mary Loughran, Rosemary Orlando, Edward Carr, Donald Saunders, Michael Davis and Terrance "TJ" McDonald and Interim Class Counsel*

[Additional counsel appear on signature page.]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY LOUGHRAN, *et al.*,<br><br>　　　　　　　Plaintiffs,<br><br>　　　　*v.*<br><br>THE CHARLES SCHWAB CORPORATION, *et al.*,<br><br>　　　　　　　Defendants. | Case No. 2:24-cv-07344-FLA (Ex)<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...........................................................................................2

II.   PARTIES ......................................................................................................6

    A.    Plaintiffs .........................................................................................6

    B.    Defendants.......................................................................................8

    C.    Relevant Non-Parties.......................................................................9

III.  JURISDICTION AND VENUE...................................................................10

IV.   CHARLES SCHWAB'S CASH SWEEP PROGRAM MISCONDUCT
    ...........................................................................................................10

    A.    The Charles Schwab Cash Sweep Programs........................................10

    B.    Charles Schwab's Agreements with Its Clients .................................15

        1.    Charles Schwab's Brokerage Accountholders.........................15

        2.    Charles Schwab's Advisory Accountholders ...........................16

        3.    Charles Schwab's Retirement Accountholders ........................17

        4.    The Plaintiffs' Relationships with Charles Schwab .................18

    C.    Charles Schwab Owed Several Independent Duties and Obligations to Its Clients in Connection with the Cash Sweep Programs........................................................................................21

        1.    Charles Schwab Had Contractual Obligations to Pay and Secure Reasonable Interest Rates on Swept Cash for Retirement Accountholders .......................................................21

        2.    Charles Schwab Had Contractual Obligations to All Accountholders to Pay and Secure Interest Rates Consistent with Prevailing Market and Business Conditions and Other Schwab Products ..................................24

        3.    Charles Schwab Had a Contractual Obligation to Act in the Best Interests of Its Clients ............................................26

        4.    Charles Schwab Owed Fiduciary Duties and Other

i

Obligations to Its Clients as an Investment Adviser and Broker-Dealer.................................................................................28

    a.    Charles Schwab's Duties as an Investment Adviser and Broker-Dealer...............................................28

    b.    Charles Schwab's Agency, Control and Discretion Over the Cash Sweep Programs....................32

5.    Charles Schwab Was Obligated to Put Its Clients' Interests Before Its Own and Mitigate Any Potential Conflicts of Interest.......................................................................................39

6.    Charles Schwab's Contracts Have an Implied Covenant of Good Faith and Fair Dealing for Charles Schwab to Provide Clients with a Reasonable Rate of Interest.................40

V.    TD AMERITRADE'S SWEEP MISCONDUCT .........................................40

    A.    The TD Ameritrade Insured Deposit Account ("IDA") Program.......40

    B.    TD Ameritrade's Agreements With Its Clients..................................45

    C.    The Plaintiffs' Relationships with TD Ameritrade.............................48

    D.    TD Ameritrade Owed Fiduciary Duties as an Agent in Establishing and Maintaining the IDA.................................................49

    E.    TD Ameritrade Owed Duties to Act in Its Clients' Best Interest .......51

    F.    TD Ameritrade Owed Additional Fiduciary Duties as An Investment Adviser..............................................................................53

    G.    TD Ameritrade Owed Additional Fiduciary Duties to Retirement Accountholders...............................................................54

    H.    TD Ameritrade Was Obligated to Treat Its Clients Fairly and in Good Faith.................................................................................56

    I.    TD Ameritrade Is Acquired by Charles Schwab ...............................56

VI.    CHARLES SCHWAB AND TD AMERITRADE BREACHED THEIR DUTIES, CONTRACTS, AND THE IMPLIED COVENANT IN ORDER TO IMPROPERLY PROFIT FROM THEIR CLIENTS' SWEPT CASH..............................................................................................59

A.    Sweep Account Rates Paid by Other Institutions ...............................64

B.    The Federal Funds Rate Benchmark.....................................................66

C.    The Interest Rates on Sovereign Short-Term Debt Benchmark .........68

D.    The Interest Rate Applicable to Short-Term Instruments Such as Repurchase Agreements ......................................................................70

E.    The Interest Rate Paid on the Schwab Intelligent Portfolio................71

F.    Charles Schwab and TD Ameritrade Breached the Implied Covenant of Good Faith and Fair Dealing to Provide Their Clients with a Reasonable Rate of Interest .........................................72

VII.   DEFENDANTS' BREACHES ENRICHED CHARLES SCHWAB AND TD AMERITRADE BY BILLIONS OF DOLLARS WHILE CAUSING SUBSTANTIAL DAMAGES TO THE CLASS ........................73

CLASS ACTION ALLEGATIONS ...................................................................78

FIRST CLAIM FOR RELIEF .............................................................................83

SECOND CLAIM FOR RELIEF ........................................................................85

THIRD CLAIM FOR RELIEF ............................................................................86

FOURTH CLAIM FOR RELIEF ........................................................................87

FIFTH CLAIM FOR RELIEF .............................................................................88

DEMAND FOR RELIEF.....................................................................................88

JURY TRIAL DEMAND .....................................................................................89

1.      This action alleges claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and unjust enrichment, on behalf of a Class of clients of Charles Schwab and TD Ameritrade who participated in the Charles Schwab Cash Sweep Programs and the TD Sweep Program during the Class Period (as these terms are further defined below) against Defendants The Charles Schwab Corporation, Charles Schwab & Co., Inc., TD Ameritrade, Inc., TD Ameritrade Clearing, TD Ameritrade Institutional Division, and TD Ameritrade Investment Management, LLC (as further defined below).[1]

2.      Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief are based on the investigation of Interim Class Counsel.  This investigation included, among other things, a review and analysis of: (1) documents related to the Charles Schwab Cash Sweep Programs and TD Sweep Program, including account opening documents, agreements, Cash Sweep Program disclosures and account statements; (2) Charles Schwab and TD Ameritrade's public filings with the U.S. Securities and Exchange Commission ("SEC") and other regulators; (3) research reports prepared by securities and financial analysts concerning Charles Schwab and TD Ameritrade; (4) transcripts of Charles Schwab and TD Ameritrade investor conference calls; (5) press releases and media reports;

---

[1] On October 26, 2020, Charles Schwab completed its acquisition of TD Ameritrade. Thereafter, TD Ameritrade clients were transitioned to the Charles Schwab platform in a multi-year process that was completed in early 2024.  Prior to their transition, TD Ameritrade clients participated in the TD Sweep Program, and thereafter in the Charles Schwab Cash Sweep Program.  Charles Schwab has operated both programs since the merger, and, as the acquiring company, bears ultimate responsibility for the liability that accrued for TD Ameritrade's pre-merger conduct.  Several of the named Plaintiffs participated in both programs by virtue of opening their accounts at TD Ameritrade, and then having their accounts transitioned to Charles Schwab. For ease of readability, "Charles Schwab" as used in this Complaint sometimes refers to both Charles Schwab and TD Ameritrade post-acquisition.

(6) proprietary data from retail banks and brokerages in the United States; (7) findings and evidence in proceedings involving Charles Schwab, including *In the Matter of Charles Schwab & Co., Inc., Charles Schwab Investment Advisory, Inc., and Schwab Wealth Investment Advisory, Inc*., Investment Advisers Act of 1940 Release No. 6047 (June 13, 2022); (8) documents published by Charles Schwab and TD Ameritrade on their websites; and (9) other material and data identified herein.

3.      Interim Class Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      INTRODUCTION

4.      This class action arises out of Charles Schwab and TD Ameritrade's drastic under-payment of interest in their bank Cash Sweep Programs and the TD Sweep Program, respectively (defined below).  Charles Schwab and TD Ameritrade ostensibly offered their cash sweep programs to clients as vehicles to earn reasonable returns on otherwise uninvested cash.  But, while acting as their clients' agent, Charles Schwab and TD Ameritrade underpaid clients for their cash in violation of their fiduciary and contractual duties, in order to enrich themselves and their affiliates, including Charles Schwab Bank, SSB; Charles Schwab Premier Bank, SSB; and Charles Schwab Trust Bank, as well as TD Bank, N.A. and TD Bank, USA, N.A.  Such unjust enrichment all came at the direct expense of Charles Schwab and former TD Ameritrade clients.

5.      Rather than pay their clients a reasonable rate of interest on their cash and put their clients' interests above their own, as they were required to do in the context of the cash sweep programs, Charles Schwab and TD Ameritrade instead paid *de minimis* rates of interest to clients while they and their affiliates improperly earned billions of dollars on that cash in periods of rising interest rates.

2

6.      Charles Schwab and predecessor TD Ameritrade both offered their cash sweep programs to brokerage accountholders, investment advisory clients, and retirement (including traditional and Roth individual retirement account ("IRA")) accountholders, educational savings, and Health Savings ("HSA") accountholders. For each type, Charles Schwab and TD Ameritrade clients often had uninvested cash from various sources—such as when they receive dividends, interest payments, or securities sale proceeds, after their deposit of additional money, or when cash is received from selling existing investments.

7.      Defendants' cash sweep programs ostensibly allow clients to earn reasonable interest on uninvested cash by "sweeping" (i.e., automatically transferring) the cash into bank deposit accounts.  Unlike in an arm's length relationship between a depositor and a bank involving bank accounts, Defendants acted as their clients' agent in establishing, maintaining, and managing the sweep accounts on behalf of their clients, automatically transferring cash in the clients' accounts to and from interest-bearing bank accounts, and determining and remitting interest earned on that cash to its clients.

8.      In establishing, maintaining, and managing the cash sweep programscash sweep programs as their clients' agents, Defendants were required to act in the best interests of their clients as fiduciaries, and had contractual duties to obtain and remit a reasonable rate of interest on cash sweep deposits—including duties to put their clients' interests ahead of their own.  In addition, the agreements between Charles Schwab and TD Ameritrade and their clients included an implied covenant of good faith and fair dealing.

9.      Rather than act as a fiduciary in the best interests of its clients with respect to the cash sweep programs or fulfill its contractual duties and implied obligation of good faith and fair dealing, Defendants used clients' funds to enrich themselves and their affiliates at clients' expense.  Among other things, Charles Schwab failed to uphold its obligation to pay a rate "consistent with their views of

prevailing market and business conditions" or provide to retirement accountholders a "reasonable rate" of interest, "consistent with applicable legal and regulatory requirements." Instead, Charles Schwab took massive profits for itself, its banks and TD Banks under the Cash Sweep Programs, thus breaching the promise to clients to "act in your best interest and not put our interest ahead of yours."

10. Charles Schwab and TD Ameritrade underpaid interest to sweep account clients by channeling clients' cash sweep deposits primarily to affiliated—rather than independent third party—banks, thus controlling and increasing the profits to itself and its affiliates, and to banks to whom it owed a contractual obligation to channel deposits as part of Charles Schwab's acquisition of TD Ameritrade. These banks included Charles Schwab affiliates Charles Schwab Bank, SSB; Charles Schwab Premier Bank, SSB; and Charles Schwab Trust Bank, as well as TD Bank, N.A., and TD Bank, USA, N.A., who were the sole recipients of cash from Charles Schwab's clients' accounts through its Cash Sweep Programs following the acquisition.

11. Over the last several years, rising interest rates presented an opportunity for Charles Schwab and TD Ameritrade clients to earn significantly more interest on their cash sweep account balances. In this environment—in which the Federal Funds Rate (the interest rate at which banks lend to one another) skyrocketed from a low of 0.08% in early 2022 to a high of 5.33% in 2024—Charles Schwab kept the interest rates paid on the swept cash in its Cash Sweep Programs at rates from as low as 0.01% to a maximum rate of 0.45%. By improperly keeping the interest rates paid on the cash sweep programs artificially low, Charles Schwab (and predecessor TD Ameritrade)—while acting as its clients' agent vis-à-vis the Programs—usurped the opportunity of rising interest rates for itself, leveraging its clients' cash for its own benefit and earning massive profits for itself and its related banks. In doing so, Charles Schwab meaningfully increased its Net Interest Income (i.e., the difference between the interest it earned on the cash and the interest amounts paid to clients),

which grew from $6.1 billion in 2020 to $9.1 billion in 2024—an increase of *over 49%*.

12. Contrary to their contractual and fiduciary obligations, Defendants unreasonably ignored relevant business and economic conditions and the market of comparable interest rates in setting cash sweep interest rates. Again, while the Federal Funds Rate increased during the Class Period to a high of 5.33% in 2024, Charles Schwab clients enrolled in the Cash Sweep Programs in the lowest asset tier were only paid 0.01% to a maximum rate of 0.45% while TD Ameritrade sweep rates in the lowest tier were only paid 0.01% to a maximum rate of 0.34%.

13. Nor did Charles Schwab (or its predecessor) set its sweep interest rates based on "prevailing market and business conditions" or provide to retirement accountholders a "reasonable rate" of interest "consistent with applicable legal and regulatory requirements," as its contracts and agency relationship with its clients required. In fact, brokerages that do *not* sweep their cash to affiliated banks (as Charles Schwab does) typically paid far higher interest rates.

14. There is nothing reasonable or fair about the rates Charles Schwab paid to its clients with cash sweep accounts, or about Charles Schwab using its clients' cash balances to reap windfall profits. Indeed, Charles Schwab's behavior was particularly harmful to its clients who have suffered through record inflation over the past few years.

15. Charles Schwab's misconduct constituted, and continues to constitute, an ongoing series of breaches of its fiduciary duties, of its contracts with accountholders, and of the implied covenant of good faith and fair dealing. Plaintiffs, individually and on behalf of the proposed Class and sub-Classes defined herein, bring this class action to remedy the significant financial harm caused by Charles Schwab's misuse of its cash sweep programs to enrich itself at the expense of its clients.

## II.    PARTIES

### A.    Plaintiffs

16.    Plaintiff Mary Loughran is a citizen of Colorado, who maintained a brokerage account and multiple IRAs, including a SEP IRA, with Defendant Charles Schwab & Co., Inc., which is a registered investment adviser, during the relevant period. Plaintiff Loughran established her SEP IRA account with TD Ameritrade no later than September 2015. In 2020, Charles Schwab & Co., Inc. acquired TD Ameritrade (including its liabilities), and thereafter all of TD Ameritrade's accounts were transitioned to Charles Schwab & Co., Inc. over the subsequent four years. Ms. Loughran's SEP IRA account with TD Ameritrade was transitioned to Charles Schwab & Co., Inc. in September 2023. From the start of the Class Period, the cash balances held in Ms. Loughran's SEP IRA account were automatically "swept" into a low interest-bearing bank account at TD Bank, N.A. pursuant to the TD Ameritrade Insured Deposit Account ("IDA") program. For Ms. Loughran's accounts with Charles Schwab that were enrolled in the Cash Sweep Programs, the cash balances held in those accounts were automatically "swept" into low interest-bearing bank accounts, including at Charles Schwab-affiliated banks.

17.    Plaintiff Rosemary Orlando is a citizen of Ohio, who maintained a brokerage account and multiple retirement accounts with Defendant Charles Schwab & Co., Inc. during the relevant period.  The cash balances held in Ms. Orlando's accounts were automatically "swept" into low interest-bearing bank accounts at Charles Schwab Trust Bank, pursuant to the Cash Sweep Programs.

18.    Plaintiff Edward Carr is a citizen of Pennsylvania, who maintained a brokerage account with Defendant Charles Schwab & Co., Inc. during the relevant period.  The cash balances held in Mr. Carr's account were automatically "swept" into low interest-bearing bank accounts, including at Charles Schwab-affiliated banks, pursuant to the Cash Sweep Programs.

6

19.    Plaintiff Donald Saunders is a citizen of Missouri, who maintained an IRA with Defendant Charles Schwab & Co., Inc.  Mr. Saunders established his IRA account with TD Ameritrade in 2013.  Saunders' TD Ameritrade account was transitioned to Charles Schwab & Co., Inc. on September 5, 2023.  From the start of the Class Period until September 5, 2023, the cash balances held in Mr. Saunders' account were automatically "swept" into low interest-bearing bank account at TD Bank, N.A. pursuant to the IDA program.  After September 5, 2023, the cash balances held in Mr. Saunders' account were automatically "swept" into a low interest-bearing bank account at TD Bank, N.A. pursuant to the Cash Sweep Programs.

20.    Plaintiff Michael Davis is a citizen of Maryland, who maintained a retirement account with Defendant Charles Schwab & Co., Inc., as well as a brokerage account during the relevant period.  Mr. Davis's accounts were established with TD Ameritrade no later than 2006.  Mr. Davis's TD Ameritrade accounts were transitioned to Charles Schwab & Co., Inc. on September 5, 2023.  From July 2022 until September 2023, the cash balances held in Mr. Davis's accounts were automatically "swept" into a low interest-bearing bank account at TD Bank, N.A. pursuant to the IDA program.  After September 2023, through September 2024, the cash balances held in Mr. Davis's account were automatically "swept" into a low interest-bearing bank account at TD Bank, N.A. pursuant to the Cash Sweep Programs.

21.    Plaintiff Terrance "T.J." McDonald is a citizen of Illinois, who maintained a brokerage account and retirement accounts with Defendant Charles Schwab & Co., Inc. during the relevant period.  The cash balances held in Mr. McDonald's accounts were automatically "swept" into a low interest-bearing bank account at TD Bank, N.A. pursuant to the Cash Sweep Programs.

**B.    Defendants**

22.    Defendant The Charles Schwab Corporation is a Delaware holding corporation with its principal place of business in Westlake, Texas.  Through its operating subsidiaries, The Charles Schwab Corporation provides a full range of brokerage, banking, and financial advisory services.

23.    Defendant Charles Schwab & Co., Inc. ("CS&Co") is a California corporation with its principal place of business in Westlake, Texas.  It is the wholly-owned broker-dealer subsidiary of The Charles Schwab Corporation.

24.    Defendant TD Ameritrade, Inc., Defendant TD Ameritrade Clearing ("Clearing"), and Defendant TD Ameritrade Institutional Division ("TD Institutional Division") were referred to collectively during the Class Period as "TD Ameritrade."  During the Class Period, TD Ameritrade was a "provider of securities brokerage services and related technology-based financial services to retail clients and independent registered investment advisors."

25.    Defendant TD Ameritrade Investment Management, LLC ("TDAIM") was a registered investment adviser with the SEC, and an affiliate of TD Ameritrade, that provided investment advisory services to TD Ameritrade clients enrolled in the TD Sweep Program.

26.    Effective October 6, 2020, Charles Schwab completed its acquisition of TD Ameritrade Holding Corporation, including its consolidated subsidiaries. According to Charles Schwab's SEC filings, as of May 2024, Charles Schwab completed the final account conversions to Charles Schwab & Co., Inc. from the Ameritrade broker-dealers, TD Ameritrade, Inc. and Clearing.  According to Charles Schwab, these entities are accordingly "no longer principal business subsidiaries."[2]

_____

[2] Charles Schwab's acquisition of TD Ameritrade involved a subsidiary of Schwab (Americano Acquisition Corp., a Delaware corporation and a direct, wholly-owned subsidiary of The Charles Schwab Corporation) merging with, and into, TD

27. The Charles Schwab Corporation and CS&Co. are referred to collectively as the "Charles Schwab Defendants" or "Charles Schwab." TD Ameritrade, Inc., Clearing, TD Ameritrade Institutional Division, and TDAIM are referred to collectively as the "TD Ameritrade Defendants." The "TD Ameritrade Defendants" and the "Charles Schwab Defendants" are referred to herein collectively as "Defendants."

### C.    Relevant Non-Parties

28. Non-Parties Charles Schwab Bank, SSB ("Charles Schwab Bank"), Charles Schwab Premier Bank, SSB ("Charles Schwab Premier Bank") and Charles Schwab Trust Bank are separate but affiliated companies and wholly owned subsidiaries of The Charles Schwab Corporation.

29. Non-Parties TD Bank, N.A. ("TD Bank") and TD Bank, USA, N.A. ("TD Bank USA") are wholly-owned subsidiaries of The Toronto-Dominion Bank. According to its 2024 Annual Report, The Toronto-Dominion Bank "has significant influence over the Charles Schwab Corporation . . . and the ability to participate in the financial and operational policy-making decisions of Schwab through a combination of the Bank's ownership, board representation and the insured deposit account agreement between [The Toronto-Dominion] Bank and Schwab."

---

Ameritrade Holding Corporation, with TD Ameritrade surviving as a wholly-owned subsidiary of Schwab. The November 2019 agreement and plan of merger between Charles Schwab and TD Ameritrade stated that: "From and after the Effective Time, the Surviving Corporation [TD Ameritrade Holding Corporation] shall possess all the rights, powers, privileges and franchises and *be subject to all of the obligations, liabilities*, restrictions and disabilities of the Company [TD Ameritrade Holding Corporation] and Merger Sub [Americano Acquisition Corp.], all as provided under the Delaware Law." For quoted material in this Complaint, bold and italics emphasis is added unless otherwise noted.

9

## III.    JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and Plaintiffs and other Class members are citizens of States different from Defendants.

31.    The Court has personal jurisdiction over Defendants because Defendants conduct substantial business in this District and Defendant Charles Schwab & Co., Inc. is a California corporation.

32.    Venue is proper under 28 U.S.C. § 1391 because, among other things, a substantial part of the events and/or relevant conduct by Defendants and their subsidiaries giving rise to Plaintiffs' claims occurred in this District.

## IV.    CHARLES SCHWAB'S CASH SWEEP PROGRAM MISCONDUCT

### A.    The Charles Schwab Cash Sweep Programs

33.    Charles Schwab offers its clients a program it calls the "Cash Features Program" whereby cash in eligible Charles Schwab accounts is automatically "swept" into one of several options ("Cash Features") purportedly to earn interest on those cash balances.  Those Cash Features include (i) the "Bank Sweep"; and, for retirement accounts, (ii) the "Bank Sweep for Benefit Plans" Features, (iii) the "Schwab One Interest" Feature, and (iv) the "Money Fund Sweep" Feature.  At issue in this case are the "Bank Sweep," and "Bank Sweep for Benefit Plans" Features which are collectively referred to herein as the "Cash Sweep Programs."

34.    The Charles Schwab Cash Sweep Programs sweep client cash into interest-bearing deposit accounts at one of five banks that are either affiliated with Charles Schwab, or to whom Charles Schwab was contractually bound to channel its clients' money.  The Charles Schwab banks are Charles Schwab Bank, Charles Schwab Premier Bank, and Charles Schwab Trust Bank (collectively, the "Charles Schwab Banks" or the "Affiliated Banks").  In addition, following Charles Schwab's 2020 acquisition of TD Ameritrade, TD Bank and TD Bank, USA (collectively, the

10

"TD Banks") were added to the Cash Sweep Programs.[3] The Charles Schwab Banks and TD Banks are referred to collectively as the "Program Banks."

35.    Charles Schwab established the Bank Sweep Feature in 2003 in connection with the establishment of Charles Schwab Bank. It became the default option for all new accounts in 2016. In 2018 and 2019, Charles Schwab eliminated its money market fund sweep option for most clients and forcibly transferred clients into significantly lower-yielding bank sweep accounts. Peter Crawford, Charles Schwab's CFO from 2017 until October 2024, acknowledged during a 2018 investor conference call that this move was "accretive to revenue," explaining that Charles Schwab was only earning 0.5% service fees on the money market funds, whereas its net interest margin on its customers' cash was over 2%. By contrast, Charles Schwab clients' interest rate on cash deposits was reduced five-fold, from 1.5% to 0.3%.

36.    Put differently, Charles Schwab established the Cash Sweep Programs to *reduce* interest income to Charles Schwab's clients to line its own pockets. A 2019 Deutsche Bank analyst report found that Charles Schwab's clients collectively lost nearly $2.5 billion annually in interest as a result of Charles Schwab's lowering of interest rates.

37.    Charles Schwab offers both a Single-Bank Version and Multiple-Bank Version of the Cash Sweep Programs. For each version, Charles Schwab, in its discretion, selects the Program Banks. For the Single-Bank Version, Charles Schwab Bank is the only sweep option. For the Multiple-Bank Version, Charles Schwab will assign its clients up to three Program Banks per account. Charles Schwab clients are precluded from excluding any of the Program Banks as a destination for their cash balances under the Multiple-Bank Version.

---

[3] Charles Schwab disclosed in 2024 that it is contractually obligated to sweep client cash to the TD Banks.

11

38.     Under the Cash Sweep Programs, Charles Schwab, acting as its clients' agent, opens two deposit accounts on its clients' behalf at the Program Banks: a demand deposit account ("DDA") and a money market deposit account ("MMDA"). Because Charles Schwab "limits the number of transfers from an MMDA at a Program Bank to six during a monthly statement cycle," Charles Schwab, in its discretion, determines the minimum balance its clients need to maintain in the DDA to satisfy debits in the account, and transfers funds from the MMDA to the DDA on its clients' behalf, as needed, to maintain that balance.  If a client reaches the six-transfer limit, Charles Schwab will transfer all of the remaining balance from the MMDA to the DDA and make all future transactions in the DDA for the rest of that month.  Interest rates paid to Charles Schwab clients in the Cash Sweep Programs are set by Charles Schwab, and the rates paid by each of the Program Banks were the same.  For example, the 2020-2024 Cash Features Program Disclosure Statements state "[f]or both the Bank Sweep and Bank Sweep for Benefit Plans Features, the [banks] will pay the same interest rate on the DDA and MMDA."  The 2024 Cash Features Program Disclosure Statement further states that, "as a contractual matter, the rates paid to Charles Schwab clients for cash swept to TD Bank and TD Bank, USA is the same as the rates paid by the Schwab-affiliated Banks. . . ."  For the Bank Sweep Feature only, the interest rates vary by tiers based on a client's "balances placed with the Program Banks." However, the rates paid were the same across the Program Banks.

39.     Under the Cash Sweep Programs, the Program Banks profited from the "spread" between the *de minimis* rates they set for, and paid, their clients and the interest they earned on the clients' cash balances.  For example, the 2022 Cash Features Program Disclosure Statement stated that:

> The Program Banks and the Affiliated Program Banks intend to use the cash balances in the Deposit Accounts to fund current and new investments. In addition, the Program Banks, Schwab Bank, and Schwab Premier Bank intend to use the cash balances in the Deposit

12

Accounts to fund current and new lending activities. The profitability on such activities is generally measured by the difference, or "spread," between the interest rate paid on the Deposit Accounts and other costs of maintaining the Deposit Accounts, and the interest rate and other income earned by an Affiliated Program bank on the loans and investments made with the funds in the Deposit Accounts. The income that the Affiliated Program Banks will have the opportunity to earn through their lending and investing activities is expected to be greater than the fees earned by Schwab and its affiliates from managing and distributing the Schwab Sweep Money Funds. Such deposits are anticipated to provide a stable source of funds for the Affiliated Program Banks' lending and investing activities. The cash balances can also be used to provide funds to develop products and services for Schwab-affiliated companies to the extent permitted by applicable law.

40.    The 2022 Cash Features Program Disclosure Statement further states that:

Schwab provides administrative services to the Program Banks, including the Affiliated Program Banks, in support of the operation of the Bank Sweep and Bank Sweep for Benefit Plans Features. The Affiliated Program Banks pay Schwab an annual per account flat fee for these administrative services. Program Banks that are not affiliated with Schwab instead pay Schwab an administrative fee based upon the total amount of dollars swept to that bank via the Bank Sweep and Bank Sweep for Benefit Plan Features. . . . [and] certain of our employees and registered representatives can be compensated, in part, based directly or indirectly on deposit balances in the Bank Sweep and Bank Sweep for Benefit Plan Features or the profitability of the features for the Affiliated Program Banks and The Charles Schwab Corporation. Information regarding the fee and other compensation we currently receive from the Program Banks for these administrative, operational, technology, and other services may be obtained by written request. . .

41.    Under this arrangement, Charles Schwab sets the interest rate its clients receive, and each client receives the same rate regardless of which bank holds the client's cash.

42.    In addition, Charles Schwab owed specific contractual obligations to its retirement account clients to pay a "***reasonable rate of interest***" on their cash sweep

13

balances. Specifically, in the Cash Features Program Disclosure Statements throughout the Class Period, Charles Schwab promised clients that "Retirement and other benefit plan accounts *will be paid a reasonable rate consistent with applicable legal and regulatory requirements*."

43. Charles Schwab asserts that "[i]nterest rates on the Deposit Accounts may be established periodically by the Program Banks at a rate as low as possible . . .", and "[i]n setting interest rates, the Program Banks have the option to pay as low a rate as possible," which constitutes a conflict of interest, but Charles Schwab was restricted by its promise and obligation to still pay clients a "reasonable rate" to "retirement and other benefit plan accounts." Charles Schwab also promised its clients that its cash sweep interest rates would need to be "consistent with" "prevailing market and business conditions." For example, the 2022 Cash Features Program Disclosure Statement promised clients that:

> Interest rates on the Deposit Accounts will be established periodically by the Program Banks at a rate as low as possible *consistent with their views of prevailing market and business conditions*.

* * *

> In setting interest rates, the Program Banks have the option to pay as low a rate as possible, *consistent with their views of prevailing market and business conditions.*

As discussed further below, Charles Schwab made similar representations regarding prevailing market and business conditions in the other Class Period Cash Features Disclosure Statements, which included subsequent removal of the reference to "their views" of prevailing market and business conditions.

44. Charles Schwab thus promised its clients that Charles Schwab would set interest rates consistent with "prevailing market and business conditions" and provide to retirement accountholders a "reasonable rate" of interest. Charles Schwab failed to honor those promises.

14

**B.     Charles Schwab's Agreements with Its Clients**

45.    The relationships among Charles Schwab and all its brokerage accountholders, retirement accountholders (including traditional IRA or Roth IRA accounts) and investment advisory clients, including Plaintiffs, are set forth in a series of agreements, disclosures and supplements thereto.

**1.     Charles Schwab's Brokerage Accountholders**

46.    To establish brokerage relationships with Charles Schwab, Class members executed account applications.  Class members who had Schwab One brokerage accounts were assigned the Bank Sweep as their Cash Feature option.  For example, during the Class Period, the Schwab Global Account and Schwab One Brokerage Account Combination Application stated:

> The Bank Sweep feature is an available Cash Feature for brokerage account holders residing in the U.S. . . . By signing this Application, you consent to participate in Schwab's Cash Features Program, as described in the Cash Features Disclosure Statement, and you also consent to having the Bank Sweep feature as your designated Cash Feature.

47.    In addition to the account applications, the Charles Schwab account agreements also set forth the terms of the client's agreement with Charles Schwab. For example, during the Class Period, the Schwab One Brokerage Account Application Agreement stated:

> **Section 1: Scope of Agreement.**  Your agreement with Schwab consists of the terms set forth in this Application Agreement and the terms set forth in the Schwab One Account Agreement, which incorporates the *Charles Schwab Pricing Guide* and a number of other important disclosures. . . .  In addition, you may in the future receive from Schwab supplemental terms or disclosures that pertain to certain account types, service features and benefit packages. These supplemental terms and disclosures, this Application Agreement and the Schwab One Account Agreement are collectively referred to as the "Agreement and Disclosures." . . .

> **Section 2: Acceptance of Agreement and Disclosures.** You agree that

15

the Agreement and Disclosures govern all aspects of your relationship with Schwab, including all transactions between Schwab and you and all products and services now or in the future offered through Schwab.

(Emphasis in original).

48.　The Schwab One Brokerage Account Application attached a summary of the Cash Features Program titled "Cash Features Program General Terms and Conditions" that made clear that the Cash Features Program was governed by the terms and conditions set forth in the Account Agreement and the Cash Features Program Disclosure Statement:

The automatic investment of your free credit balance, including the frequency and the amount of each sweep, is governed by the terms and conditions set forth in the Cash Features Disclosure Statement and in the Account agreement applicable to your account. . . .  If there is any conflict between the descriptions in this document and the terms of the Cash Features Disclosure Statement, the Cash Features Disclosure Statement will control.

### 2.　Charles Schwab's Advisory Accountholders

49.　Similarly, with regard to advisory clients, the Wealth Advisory Agreement noted during the Class Period that "Schwab Wealth Advisory ('SWA') (formerly known as Schwab Private Client ['SPC']) is a fee-based program for accounts you elect to enroll in SWA," and the "Agreement supplements [an advisory client's] brokerage account agreement(s) with Schwab, which together govern Schwab's contractual relationship with you."

50.　Under the section titled "**Other Important Provisions,**" the Wealth Advisory Agreement also states that "[y]ou agree to the following cash sweep feature that is part of the SWA program," and that "[m]ore information about . . . cash sweep options may be found in your brokerage account agreement(s) and in the Cash Features Disclosure Statement[.]"

### 3.  Charles Schwab's Retirement Accountholders

51.  For retirement accounts, the terms of a retirement accountholder's agreements were set forth in the Schwab IRA and ESA Account Agreement that applied to traditional IRAs, Roth IRAs, Custodial IRAs and Education Savings Accounts ("ESA").  For example, the IRA and ESA Account Agreement stated during the Class Period that "[t]his Agreement contains important terms and conditions that apply to Schwab IRAs and services for Schwab IRAs, including the Traditional IRA and the Roth IRA."  In addition, the IRA and ESA Account Agreement stated, "This Agreement also contains important terms and conditions that apply to Schwab Education Savings Accounts and services for all Schwab Education Savings Accounts."

52.  The IRA and ESA Account Agreement outlines the terms of the Cash Features Program and refers to the Cash Features Disclosure Statement for a description of the Cash Features Program and how it operates:

> Schwab's Cash Features Program is the service described in the Cash Features Disclosure Statement that we provide to automatically invest, or "sweep," the Free Credit Balance in your Account into a liquid investment or to earn interest from Schwab on the Free Credit Balance in your Account. . .
>
> When you opened your Account, you either selected a Cash Feature or were informed of the Cash Feature that was designated for your Account.
>
> You authorize Schwab to make deposits, withdraw cash, or purchase and redeem securities in accordance with the eligible Cash Feature you have designated or the Cash Feature that has been designated for your Account. . .
>
> **Sweep Procedures for the Bank Sweep, Bank Sweep for Benefit Plans, and Money Market Sweep Features**
>
> You authorize us to act as your agent to make deposits to and withdrawals from deposit accounts at one or more banks affiliated with Schwab or purchase and sell shares in a Schwab® Sweep Money Fund

in accordance with the Cash Features Disclosure Statement.

(Emphasis in original).

53.     For both brokerage and retirement accountholders, each Cash Features Disclosure Statement throughout the Class Period stated that "Schwab will notify you in writing of changes to the terms of the Cash Features . . . , changes to the Cash Features we make available, or a change in the Cash Features Program prior to the effective date of the proposed change."  Each Cash Features Disclosure Statement throughout the Class Period also stated that "this document . . . replaces prior version(s) of Cash Features Disclosure Statements Schwab has provided to you."

**4.      The Plaintiffs' Relationships with Charles Schwab**

54.     Ms. Loughran first opened an account with Charles Schwab on March 12, 1996, and thereafter opened a SEP IRA account with TD Ameritrade.  Upon the transition of her SEP IRA account from TD Ameritrade to Charles Schwab, Ms. Loughran received a letter from Charles Schwab informing her on September 1, 2023 that she had been enrolled in Charles Schwab's Bank Sweep feature, and her account statements reflect her enrollment in the Bank Sweep feature. For Ms. Loughran's relevant accounts, including her IRA SEP account following its transition to Charles Schwab, the "Terms and Conditions" of her account statements also stated that "[f]or . . . important disclosures about bank sweep feature(s) in your Account(s), please refer to the Cash Features Disclosure Statement[.]" Accordingly, Ms. Loughran's relationship with Charles Schwab was governed by each Cash Features Disclosure Statement that was in effect throughout the life of her Charles Schwab accounts.

55.     Ms. Orlando first opened an account with Charles Schwab no later than March 2021. Ms. Orlando's account statements reflect her enrollment in the Bank Sweep feature. The "Terms and Conditions" of her relevant account statements also stated that "[f]or . . . important disclosures about bank sweep feature(s) in your

Account(s), please refer to the Cash Features Disclosure Statement[.]" Accordingly, Ms. Orlando's relationship with Charles Schwab was governed by each Cash Features Disclosure Statement that was in effect throughout the life of her accounts.

56.    Mr. Carr executed a Schwab One Account Application for Personal Accounts on February 5, 2015. Mr. Carr's account application stated, under the heading "Your Consent to Enroll in Schwab's Cash Features Program":

> By singing this Application, you consent to having the free credit balances in your brokerage account included in the Cash Features Program. You understand that the Schwab Bank Sweep feature will be automatically included on accounts of account holders residing in the U.S. . . .
>
> You acknowledge receipt of the Cash Features Program General Terms and Conditions that is attached to this Application. You understand that the Cash Features Program . . . [is] governed by the Schwab One Account Agreement and acknowledge that additional information is available within the Cash Features Disclosure Statement applicable to your account. You understand and agree that Schwab may upon 30 days' advance written notice (1) make changes to the terms and conditions of the Cash Features Program; [and] (2) make changes to the terms and conditions of a product currently available through the Cash Features Program[.]

Additionally, the "Terms and Conditions" of Mr. Carr's relevant account statements stated that "[f]or . . . important disclosures about bank sweep feature(s) in your Account(s), please refer to the Cash Features Disclosure Statement[.]" Accordingly, Mr. Carr's relationship with Charles Schwab was governed by those agreements as well as each Cash Features Disclosure Statement that was in effect throughout the life of his account.

57.    According to Mr. Saunders' account statements, his TD Ameritrade account was transferred to a Contributory IRA at Charles Schwab in September 2023. After his account was transitioned to Charles Schwab in September 2023, Mr. Saunders' account statements reflected his enrollment in the Bank Sweep feature.

19

Additionally, the "Terms and Conditions" of his account statements post-transition stated that "[f]or . . . important disclosures about bank sweep feature(s) in your Account(s), please refer to the Cash Features Disclosure Statement[.]" Accordingly, Mr. Saunders' relationship with Charles Schwab was governed by each Cash Features Disclosure Statement that was in effect from September 2023 through present.

58. Upon the transition of his accounts from TD Ameritrade to Charles Schwab, Mr. Davis received a letter from Charles Schwab informing him on September 1, 2023 that he had been enrolled in Charles Schwab's Bank Sweep feature. Mr. Davis also received "Important Account Agreement and Disclosure Information" for his Schwab One Account, and an "IRA and ESA Account Agreement" for his IRA, both dated April 2023. In addition, after Mr. Davis's accounts were transitioned to Charles Schwab, the "Terms and Conditions" of his account statements stated that "[f]or . . . important disclosures about bank sweep feature(s) in your Account(s), please refer to the Cash Features Disclosure Statement[.]" Accordingly, Mr. Davis's relationship with Charles Schwab was governed by those agreements as well as each Cash Features Disclosure Statement that was in effect from September 1, 2023 through present.

59. Upon executing an account application, Mr. McDonald received a packet of "Important Account Agreement and Disclosure Information," which included a Schwab One Account Agreement and Cash Features Disclosure Statement, each dated July 2018. That "Important Account Agreement and Disclosure Information" packet stated that the documents contained within "govern your account with Charles Schwab & Co., Inc." Mr. McDonald also received a Schwab IRA and ESA Account Agreement, dated October 2024, which stated that it "contains important terms and conditions that apply to Schwab IRAs and services for Schwab IRAs." Mr. McDonald's account statements reflected his enrollment in the Bank Sweep feature. The "Terms and Conditions" of Mr. McDonald's account

20

statements also stated that "[f]or . . . important disclosures about bank sweep feature(s) in your Account(s), please refer to the Cash Features Disclosure Statement[.]" Accordingly, Mr. McDonald's relationship with Charles Schwab was governed by those agreements as well as each Cash Features Disclosure Statement that was in effect throughout the life of his accounts.

60. Because all Class members, including Plaintiffs, were parties to client agreements that incorporated Charles Schwab's subsequent disclosures, each Class member's agreement with Charles Schwab incorporated throughout the Class Period each successive iteration of the disclosures referenced herein, including, among others, the Cash Features Program Disclosure Statement, the Best Interest Disclosure, and the Relationship Summary, during the periods of time in which they were operative.

**C.    Charles Schwab Owed Several Independent Duties and Obligations to Its Clients in Connection with the Cash Sweep Programs**

61. Charles Schwab has repeatedly acknowledged numerous contractual, fiduciary, and implied duties to its clients with respect to its Cash Sweep Programs, including duties to put its clients' best interests ahead of its own.

62. The relationships among Charles Schwab and all its brokerage, retirement, and advisory account clients, including Plaintiffs, along with the contractual, fiduciary, and other duties and obligations that Charles Schwab owes to each, are set forth in multiple agreements, as detailed herein.

**1.    Charles Schwab Had Contractual Obligations to Pay and Secure Reasonable Interest Rates on Swept Cash for Retirement Accountholders**

63. Charles Schwab owed contractual obligations to its retirement account clients to pay a "***reasonable rate of interest***" on swept cash. Specifically, in the Cash Features Program Disclosure Statements throughout the Class Period, Charles

21

Schwab promised that "Retirement and other benefit plan accounts will be paid a reasonable rate consistent with applicable legal and regulatory requirements."

64.    In addition, in the Cash Features Program General Terms and Conditions in effect throughout the Class Period, Charles Schwab promised that the interest rate on the Bank Sweep for Benefit Plans feature was set by affiliated banks, which "intend to pay interest consistent with reasonable rate provisions of applicable legal and regulatory requirements."[4]

65.    Charles Schwab's promise to pay a reasonable rate of interest to retirement accountholders is consistent with the applicable legal and regulatory requirements of Section 4975 of the Internal Revenue Code ("IRC").  Specifically, IRC Section 4975 taxes "prohibited transactions," including when a plan sponsor for an IRA engages in transactions with a "disqualified person who is a fiduciary whereby he deals at with the income or assets of a plan in his own interest or for his own account."  26 U.S.C. § 4975(c).  A "disqualified person" includes companies or individuals "providing services to the plan," 26 U.S.C. § 4975(e)(2)(B), including the custodians and banks that receive deposits swept from Charles Schwab retirement accounts—i.e., Charles Schwab Bank and the other banks participating in the Cash Sweeps Programs.[5]

66.    The IRC provides several "exemptions" or safe harbors for these "prohibited transactions," one of which is "the investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution."  26 U.S.C. § 4975(d)(4).

67.    Treasury regulations similarly provide that when "a bank or similar financial institution that invests plan assets in deposits in itself or its affiliates under

---

[4] The Cash Features Program General Terms and Conditions contained substantially identical language throughout the Class Period.

[5] A "plan" is defined as including "an individual retirement account described in [Internal Revenue Code §] 408(a)"—i.e., an IRA.  26 U.S.C. § 4975(e)(1)(B).

22

an authorization contained in a plan . . . such authorization must name such bank or similar financial institution and must state that such bank or similar financial institution may make investments in deposits which bear a reasonable rate of interest." 26 C.F.R. § 54.4975-6(b)(3)(i).

68. Charles Schwab thus has both a legal duty (under the IRC) and contractual duty (by promising that "Retirement and other benefit plan accounts will be paid a reasonable rate consistent with applicable legal and regulatory requirements") to pay to its retirement and other benefit plan clients reasonable interest rates on the clients' cash balances.

69. Significantly, the IRC, other federal statutes, and regulatory guidance provide guidance on what constitutes a "reasonable" interest rate. For example, in 2003, the Department of Labor issued an exemption to certain transactions and, in granting the exemption, gave the following definition of a "reasonable" rate of interest:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

68 Fed. Reg. 34646, 34648 (June 10, 2003).

70. Another principle relevant to whether Charles Schwab paid a "reasonable" rate of interest as contemplated by IRC Section 4975—and one found throughout the regulations governing ERISA fiduciary standards—is whether the rate reflects what would be paid in an "arm's length" transaction. For example, Black's Law Dictionary defines "arm's length" as "involving dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power; not involving a confidential relationship." Arm's

23

Length, Black's Law Dictionary (11th ed. 2019).  Similarly, IRS regulations define an "arm's length interest rate" as:

> [A] rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances.

26 C.F.R. § 1.482-2(a)(2).

71.     In other words, and as set forth further below, there were numerous readily available comparative rates that Charles Schwab should have considered in assessing whether its rates on cash sweep deposits were "reasonable," as promised to clients.

### 2.     Charles Schwab Had Contractual Obligations to All Accountholders to Pay and Secure Interest Rates Consistent with Prevailing Market and Business Conditions and Other Schwab Products

72.     For *all* clients in the Cash Sweep Programs, Charles Schwab promised to pay interest rates consistent with "***prevailing market and business conditions***" and reasonably comparable to rates paid on its other "Cash Features," including money market fund rates.

73.     In the Cash Features Disclosure Statements throughout the Class Period, Charles Schwab promised its clients to pay interest rates on swept cash that were "consistent with ***prevailing market and business conditions.***"

74.     Specifically, from 2020 through 2022, the Cash Features Disclosure Statement stated: "Interest rates on the Deposit Accounts will be established periodically by the Affiliated Banks at a rate as low as possible ***consistent with their views of prevailing market and business conditions***."  Charles Schwab's disclosure that it would pay a rate that was "as low as possible" was cabined by its promise to pay a rate that was consistent with the affiliated banks' " views of prevailing market and business conditions."  Charles Schwab was further expressly and impliedly obligated to pay a "reasonable" rate of interest to all of its accountholders.

24

Accordingly, any rate paid by Charles Schwab—even if "as low as possible"—had to be consistent with prevailing market and business conditions and reasonable.

75.    In 2023, Charles Schwab revised this language and promised its clients that "Interest rates on the Deposit Accounts *will be* established at a rate as low as possible ***consistent with prevailing market and business conditions*.**"  Tellingly, Charles Schwab no longer stated that rates would be consistent with "their views" of "prevailing market and business conditions."  This removal is consistent with Charles Schwab's recognition that the interest rates paid to its clients on swept cash had to be consistent with an ***objective*** view of "prevailing market and business conditions," not Charles Schwab's or the affiliated banks' view.

76.    In July 2024, Charles Schwab again revised this language and promised its clients that "Interest rates on the Deposit Accounts ***may be*** established at a rate as low as possible ***consistent with prevailing market and business conditions*.**" This further undermined any notion that Charles Schwab would unilaterally impose any cash sweep interest rate that was "as low as possible."

77.    In addition, throughout the Class Period, Charles Schwab promised all of its clients in the Cash Sweep Programs that it would pay interest rates "higher or lower than the interest rates available for other Cash Features":

> The interest rates paid on the Deposit Accounts can be ***higher or lower than the interest rates*** available for other Cash Features or to depositors making deposits directly with a Program Bank or other depository institutions in comparable accounts.

78.    Put differently, Charles Schwab promised its clients that the interest rate paid on the Cash Sweep Programs would be potentially "higher"—or reasonably comparable to—rates paid on other "Cash Features," including the "Money Fund Sweep" Feature which invested client cash in a Schwab Sweep Money Fund that paid interest rates as high as 5% during the Class Period.  However, this never occurred.  In fact, the rates paid on other Cash Features were generally many multiples higher than the interest rates paid to clients in the Cash Sweep Programs.

25

For example, The Schwab Intelligent Portfolio cash sweep program paid far higher interest rates and stood at 3.93% as of May 2025, or **78 times higher** than the 0.05% interest rate for the Cash Sweep Program as of that date.

### 3. Charles Schwab Had a Contractual Obligation to Act in the Best Interests of Its Clients

79. For **all** brokerage account clients in the Cash Sweep Programs, Charles Schwab agreed in its "Best Interest Disclosure" to comply with Regulation Best Interest, 17 § 240.15l-1 (2019) ("Reg. BI")—an SEC rule designed to ensure that Charles Schwab acted in the best interests of its clients. In that disclosure, Charles Schwab contracted to abide by Reg. BI and acknowledged a duty to all of its clients to act in their best interest when it makes a "recommendation." For example, in Charles Schwab's Best Interest Disclosure during the Class Period, Charles Schwab acknowledged that when it "makes a recommendation to you to open up an account, to buy, sell or hold any investment; or to pursue an investment strategy (each a 'recommendation'), we will do so in your best interest and not put our interest ahead of yours." It further stated that, "[a]s a broker-dealer, when we provide you with a recommendation, we have to act in your best interest and not put our interest ahead of yours."

80. Charles Schwab's Best Interest Disclosure offers examples of what it considers conflicts of interest that impact its ability to put its clients' interests ahead of its own when making a "recommendation" under Reg. BI. Included in those examples is the "spread" between what Charles Schwab or its affiliate banks earn from investing or lending its clients' cash, compared to what it pays its clients in interest. Specifically, in a section titled "Material Facts About Conflicts of Interest", the Best Interest Disclosure presents the following question and answer:

> **What are the material facts about conflicts that exist when Schwab representatives provide recommendations?**
>
> ***Schwab, our affiliates, and our representatives may make more or less money*** depending on the amount and types of assets in your accounts,

26

the frequency and type of trading you do, and other actions you might take ***based on our recommendations***. As a result, we and our representatives have a conflict of interest ***when we make recommendations to you as described below.***

Schwab and its affiliates earn more from certain assets held in your accounts than others. Higher-earning assets include . . . ***cash from which Schwab or its affiliate banks earn a "spread" between the amount we pay you in interest and the amount we can earn investing that money or lending that money to others***. . . .

(Bolded italics added.)  For this disclosure to have any meaning, the enrollment of clients in the Charles Schwab Cash Sweep Programs must itself be a recommendation—otherwise the fact that Charles Schwab earns interest on the swept cash relates to no other investment decision.  Thus, Charles Schwab's Best Interest Disclosure expressly acknowledges that the sweep of cash to the Program Banks under the Cash Sweep Programs constitutes a "recommendation" subjecting it to Reg. BI.

81.    Other Charles Schwab disclosures reinforce that conclusion.  For example, in a document titled "Relationship Summary: Broker-Dealer," Charles Schwab sets forth, in a question and answer format, a summary "highlight[ing] the nature of the brokerage relationship with our clients."  In a section with the heading:

> **What are your [Charles Schwab's] legal obligations to me when providing recommendations? How else does your firm make money, and what conflicts do you have?**

the Relationship Summary states:

> All recommendations for your brokerage account will be made in a broker-dealer capacity unless otherwise expressly stated. *When we provide you with a recommendation,* we have to act in your best interest and not put our interests ahead of yours. At the same time, the way we make money creates some conflicts with your interests….
>
> ***Here are some examples*** to help you understand what this means. ***We and our affiliates earn money from***:

27

*  *  *

*The "spread" on cash in your accounts—i.e., the difference between what we earn and what we pay you in interest*.

### 4. Charles Schwab Owed Fiduciary Duties and Other Obligations to Its Clients as an Investment Adviser and Broker-Dealer

82.     As a registered investment adviser and broker-dealer acting as an agent for its clients, and exercising control and discretion over their accounts with respect to the Cash Sweep Programs, Charles Schwab owed fiduciary duties to its clients as well as obligations implied as a matter of law.  Several of these independent duties and obligations were set forth in Charles Schwab's client agreements and disclosures.

### a. Charles Schwab's Duties as an Investment Adviser and Broker-Dealer

83.     Charles Schwab owes duties to all its clients, both as an investment adviser and as a broker-dealer.

84.     *First*, Charles Schwab is a registered investment adviser bound by the fiduciary duties imposed by the Investment Advisers Act of 1940, including duties of care and loyalty.  This includes a duty for Charles Schwab to act in the best interests of its clients, and to place the best interests of its clients ahead of its own self-interest.  Accordingly, for all advisory (or managed) accounts (including advisory IRAs), Charles Schwab was required to act as a fiduciary to its clients with respect to all aspects of the accounts, including the Cash Sweep Programs, pursuant to the Investment Advisers Act of 1940. *See* Securities and Exchange Commission Interpretation Regarding Standard of Conduct for Investment Advisers, 84 Fed. Reg. 33669, 33669 (July 12, 2019), 17 C.F.R. 276 ("Under federal law, an investment adviser is a fiduciary.").

28

85.    Under this fiduciary duty, Charles Schwab "must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words, the investment adviser cannot place its own interests ahead of the interests of its client." *Id.* at 33671.

86.    Charles Schwab incorporates these duties into its disclosures.   For example, in Charles Schwab's Relationship Summary: Investment Advisory dated 2024, Charles Schwab acknowledged that "*[w]hen we . . . act as your investment adviser*, we have to act in your best interest and not put our interest ahead of yours." (Italics in original).  Charles Schwab setting the interest rates on its client cash is an investment advisory function because it has a direct impact on the clients' returns. Charles Schwab's determination of the cash sweep vehicle available for clients, and (when Charles Schwab does so) and determination of the amount of money that clients held in cash, are further investment advisory functions because they also directly impact the clients' monetary returns on their investments.

87.    In addition, Charles Schwab's Relationship Summary: Investment Advisory acknowledged certain conflicts of interest in the way it makes money and provided the Cash Sweep Programs as an example of such a conflict:

> [T]he way we make money creates some conflicts with your interests….
>
> ***Here are some examples*** to help you understand what this means. ***We and our affiliates earn money from:***
>
> ***
>
> ***The "spread" on cash in your accounts—i.e., the difference between what we earn and what we pay you in interest.***

88.    ***Second***, similar duties are imposed on Charles Schwab under principles of broker-dealer law in connection with its Cash Sweep Programs.  Over the past several years, the SEC has repeatedly highlighted the conflicts of interest financial institutions must appropriately manage under Reg. BI—the SEC rule requiring that

29

broker-dealers' recommendations are always in the best interests of their retail clients. *See* Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33318 (July 12, 2019), 17 C.F.R. 240.15l-1. Among other things, under Reg. BI, broker-dealers like Charles Schwab are obligated to "consider reasonable alternatives, if any, offered by the broker-dealer in determining whether it has a reasonable basis for making the recommendation," 84 Fed. Reg. 33318, 33321, including with respect to whether a particular cash sweep program aligns with the best interests of the client. Charles Schwab expressly acknowledges this duty and incorporates Reg. BI obligations into its client disclosures.

89. That Charles Schwab's obligations under Reg. BI apply to the misconduct alleged here is underscored by (i) an August 3, 2022 SEC Staff Bulletin—Standards of Conduct for Broker-Dealer and Investment Advisers Conflicts of Interest; and a (ii) March 30, 2022 SEC Staff Bulletin—Standards of Conduct for Broker-Dealers and Investment Advisers Account Recommendations for Retail Investors. These Staff Bulletins made clear that broker-dealers are making recommendations when placing clients into a particular cash sweep program. In the August 3, 2022 Staff Bulletin, the SEC specifically called out the operation of cash sweep programs in two separate instances as an example of a conflict of interest in the industry, alongside practices such as commissions, markups, revenue sharing and payment for order flow, that is governed by Reg. BI. As the SEC highlighted in both Staff Bulletins, broker-dealers are obligated to act in a "retail investor's best interest and not to place their own interests ahead of the investor's interest"; broker-dealers can "recommend an account to a retail investor only when you have a reasonable basis to believe that the account is in the retail investor's best interest"; breaker-dealers "cannot recommend an account that is not in a retail investor's best interest solely based on your firm's limited product menu"; "[a]ny limitations on account types considered . . . are material facts that should be disclosed"; and the broker-

30

dealer must disclose any compensation they receive on the basis of their cash sweep programs.

90.    In its client disclosures, Charles Schwab acknowledges its duties as a broker-dealer and as an investment adviser to act in its clients' best interest, and thus acknowledges its obligations under Reg. BI.

91.    For example, in Charles Schwab's Best Interest Disclosure in effect as of 2024, Charles Schwab acknowledged its obligation to act in its clients' best interest when it makes a recommendation, stating that, "As a broker-dealer, when we provide you with a recommendation, we have to act in your best interest and not put our interest ahead of yours."  As explained above, the Best Interest Disclosure offers examples of what constitutes a "recommendation" under Reg. BI that creates a conflict of interest, and includes the "spread" between what Charles Schwab or its affiliate banks earn from investing or lending its clients' cash, compared to what it pays its clients in interest as an example of a recommendation.

92.    Charles Schwab also acknowledged in its Best Interest Disclosure in effect as of 2024 that when Charles Schwab's "representatives make a recommendation to you, they are *required to follow specific policies*," and that such policies "place certain limitations on the investment advice we give and the investment products we recommend."  Charles Schwab's Best Interest Disclosure promised that Charles Schwab's "investment recommendations are designed to be: . . . Compliant with applicable laws and regulations, including the obligation to *act in your best interest[.]*"

93.    In the same Best Interest Disclosure in effect as of 2024, Charles Schwab specifically acknowledged that it possessed "*an ongoing duty of care and a duty of loyalty to provide investment advice that is in your best interest*" as an investment adviser.

94.    Charles Schwab made additional disclosures concerning its obligations to brokerage and retirement accountholders.  For example, with respect to brokerage

31

accountholders, in its "Relationship Summary: Broker-Dealer" in effect as of 2024, Charles Schwab again acknowledged:

> All recommendations for your brokerage account will be made in a broker-dealer capacity unless otherwise expressly stated. *When we provide you with a recommendation*, we have to act in your best interest and not put our interests ahead of yours. At the same time, the way we make money creates some conflicts with your interests.
>
> ***Here are some examples*** to help you understand what this means. ***We and our affiliates earn money from:***
>
> \* \* \*
>
> ***The "spread" on cash in your accounts—i.e., the difference between what we earn and what we pay you in interest***.

95.    With respect to retirement accountholders, Charles Schwab further acknowledged its fiduciary duties when providing investment advice (as defined under ERISA). In the Best Interest Disclosure in effect as of 2024, Charles Schwab promised clients that:

> When we provide ongoing investment advice for your retirement plan account or IRA, ***we are acting as fiduciaries*** according to Title I of the Employee Retirement Income Security Act and/or the Internal Revenue Code, which govern retirement accounts. The way we make money creates some conflicts with your interests, ***so we operate under a special rule that requires us to act in your best interest and not put our interest ahead of yours***.

### b.    Charles Schwab's Agency, Control and Discretion Over the Cash Sweep Programs

96.    For all accounts in the Cash Sweep Programs, Charles Schwab agreed to act as "agent" for its clients and exercised *de facto* control and discretion over the Cash Sweep Programs. As a result, Charles Schwab was required to act as a fiduciary for its clients with respect to the Cash Sweep Programs.

97.    Charles Schwab's Cash Features Program Disclosure Statements in effect during the Class Period, which applied to both brokerage and retirement accountholders, make clear that Charles Schwab acts as an "agent" for its clients

32

with respect to the Cash Sweep Programs.  That agency relationship gives rise to a fiduciary relationship between itself and Charles Schwab clients with respect to the Cash Sweep Programs. Pursuant to the Cash Features Program Disclosure Statement, Charles Schwab acted as its clients' agent and exercised complete control over the establishment and operation of the Cash Sweep Programs, including selection of the Program Banks and the establishment of rates to be paid to its clients. Specifically, Charles Schwab promised its clients in the operative Cash Sweep Program Disclosure Statements, in effect as of 2020, that:

> [W]e, *as your agent*, will open a DDA and MMDA on your behalf at the Affiliated Bank and deposit your Free Credit Balance in them.  We will determine a minimum balance you will need to maintain in your DDA to satisfy debits in your Account. . . and will transfer funds from the MMDA to the DDA as needed to maintain that balance. We may also make other deposits into your DDA, as described under "Withdrawals."

* * *

> **Withdrawals.** *As your agent*, we will make all withdrawals necessary to satisfy debits in your Account.

* * *

> Schwab is acting *as your agent in establishing the Deposit Accounts* with the Affiliated Banks and in depositing and withdrawing funds.

(Bolded italics added; other emphasis in original).

98.    Both the Schwab One Brokerage Account Agreement as of 2020 and the IRA and ESA Account Agreement as of 2020 similarly make clear that Charles Schwab acted as an agent for its clients with respect to the Cash Sweep Programs. Specifically, Charles Schwab promised its clients "to *act as your agent* to make

33

deposits to and withdrawals from deposit accounts at one or more banks affiliated with Schwab . . . in accordance with the Cash Features Disclosure Statement."[6]

99.    In addition, Charles Schwab had *de facto* control over its clients' accounts with regard to the Cash Sweep Programs because, among other things, Charles Schwab selected the Program Banks, set and changed the interest rates on each Cash Sweep Program Feature, chose which specific Cash Sweep Program Features were available to its clients, and had the ability to "terminate" a client's use of the Cash Sweep programs.  By selecting which Cash Sweep Program options were available to certain clients, Charles Schwab effectively (and by its own admission in the Best Interest disclosures and Relationship Summary) provided recommendations to its clients in connection with the Cash Sweep Programs.  For example, Charles Schwab has control and discretion over whether clients are deemed eligible for each of the Cash Sweep Feature options, and as a result, which Cash Sweep Program was selected for the client.  As stated in the Cash Features Program Disclosure Statement from 2020[7]:

> In general, eligibility for Cash Features is based on the registered ownership of the Account and on applicable laws and regulations.  We can change these eligibility requirements or make certain Cash Features available to Accounts that do not otherwise meet the published criteria. We can change the eligibility requirements for any Cash Features or the Cash Features Program . . . .  Schwab can, at its discretion and upon written notice, terminate your use of the Bank Sweep or Bank Sweep for Benefit Plans feature. . . .

100.    Charles Schwab purported to act for the benefit of its clients when creating and implementing the Cash Sweep Programs, and making deposits and withdrawals through the Programs, and clients were instructed to communicate only

[6] The Schwab One Brokerage Account Application and the IRA and ESA Account Agreement contained substantially identical language throughout the Class Period.

[7] The Cash Features Disclosure Statements contained substantially identical language in the versions dated 2020, 2022, 2023, 2024, and 2025.

34

with Charles Schwab, and not with the Program Banks. Specifically, the Cash Features Program Disclosure Statement from 2020 stated:

> You will receive no evidence of ownership, such as a passbook or certificate. Instead, Deposit Account ownership will be evidenced by a book entry on the account records of the Affiliated Banks and by records that Schwab maintains as custodian of your Accounts.

> * * *

> [A]ny instructions regarding the movement of your funds in the Bank Sweep and Bank Sweep for Benefit Plans features must be provided by Schwab to the Affiliated Banks, and information concerning the Bank Sweep and Bank Sweep for Benefit Plans features may only be obtained from Schwab. The Affiliated Banks will not accept instructions directly from you with respect to your Deposit Accounts held through the Bank Sweep and Bank Sweep for Benefit Plans features nor provide you directly with information concerning these Cash Features.

101. In addition, Charles Schwab could change the Program Banks assigned to a client's account. Specifically, the Cash Features Program Disclosure Statement stated beginning in as early as 2022:

> **We can change the assignment of the Program Banks to your Account** (including the number of Program Banks assigned to your Account), and **we can also change the order of the Program Banks assigned to your Account. . . . You may not designate a Program Bank as ineligible to receive your funds**. . . . From time to time, we will add, delete, or replace one or more Program Banks participating in the Multiple-Bank Versions of both Cash Features.

102. Moreover, Charles Schwab had the ability to "terminate" a client's use of the Cash Sweep Programs. Specifically, the Cash Features Program Disclosure Statement stated throughout the Class Period: "Schwab can, at its discretion and upon written notice, terminate your use of the Bank Sweep or Bank Sweep for Benefit Plans Feature."

103. By selecting the Program Banks, using its discretion to set and change the interest rates offered to clients, controlling which Cash Sweep Program Features were available, determining the eligibility of its clients, controlling deposits and

35

withdrawals, and assuring clients that it was acting as their "agent," Charles Schwab undertook a fiduciary relationship as an agent with its clients, the principals.

104. The Cash Sweep Program Disclosure Statements set forth Charles Schwab's discretion to establish and modify the Cash Sweep Programs and their features, including, critically, the interest rates paid on the different asset tiers in the Cash Sweep Programs—discretion that evinces Charles Schwab's agency and fiduciary relationship with its clients. Specifically, the 2020 Cash Features Program Disclosure Statement provided that "[i]nterest rates are set at the discretion of the Affiliated Banks," and "[f]or the Bank Sweep feature only, interest rates vary by tiers based on your Deposit Account balances placed with the Affiliated Banks. . . . These tiers may change from time to time." It further provided that Charles Schwab had, and exerted, control over the terms of the Cash Sweep Program, including in the following ways:

> You understand and agree that Schwab can (1) make changes to the terms and conditions of our Cash Features Program; (2) make changes to the terms and conditions of any Cash Feature; (3) change, add or discontinue any Cash Feature; (4) change your investment from one Cash Feature to another if your Account becomes ineligible for your current Cash Feature or your Cash Feature is discontinued; and (5) make any other changes to the Cash Features Program or Cash Features as allowed by law. . . .

> If you become ineligible for a particular Cash Feature or if Schwab discontinues your Cash Feature, then you authorize Schwab to designate another Cash Feature for which your Account is then eligible and transfer the funds from the ineligible or discontinued Cash Feature to the Cash Feature designated by Schwab for you.[8]

---

[8] Substantially identical language was included in the Schwab Global Account and Schwab One Brokerage Account Combination Application, the Schwab One Brokerage Account Application and Application Agreement, the Schwab One Account Agreement, and the Schwab IRA and ESA Account Agreement during the Class Period.

105.    Separately, by automatically sweeping its clients' cash to cash sweep deposit accounts (unless the client chooses to opt out in the limited instances when an opt-out option is available), Charles Schwab recommended that cash sweep accounts would be used as the settlement option for all transactions.  Specifically, Charles Schwab's Cash Features Program Disclosure Statements throughout the Class Period explained that the cash sweep accounts will be used "to satisfy debits in your Account (money you will need for securities purchases, checking and debit card transactions, and the like). . . ."

106.    This is true with respect to all incoming funds for Charles Schwab client accounts—regardless of whether such proceeds were in the form of dividends, interest payments, or other cash received on any securities or investments. Specifically, the Schwab One Brokerage Account application provides that "[b]y signing this Application, you consent to participate in Schwab's Cash Features Program, as described in the Cash Features Disclosure Statement, and you consent to having the Bank Sweep feature as your designated Cash Feature."  Similarly, the IRA and ESA Account Agreement provided that Charles Schwab exercised discretion and control over such funds: "You authorize Schwab to make deposits, withdraw cash, or purchase and redeem securities in accordance with the eligible Cash Feature you have designated or the Cash Feature that has been designated for your Account. . . ."

107.    In exercising this near total control and discretion over its clients' cash and the placement of that cash in the Cash Sweep Programs, Charles Schwab owed a fiduciary duty to all of its clients.  That included Charles Schwab's duty to act in its clients' best interests and to place such best interests ahead of its own self-interest. Specifically, Charles Schwab had and has control and has discretion over:

- each client's "eligibility" for each sweep program vehicle and whether the client's cash is swept into the Single Bank Version or Multiple-Bank Version of the Bank Sweep Feature;

- the characteristics and parameters of each of the available Cash Sweep Program options;

- if deposited into a Bank Deposit Sweep, the Program Banks in which clients' swept cash was deposited;

- the rates of interest paid on the Cash Sweep Program deposits (including because they were set by banks affiliated with Charles Schwab);

- the speed at which uninvested cash is swept into sweep vehicles (with Charles Schwab retaining any interest earned, generally at the Federal Funds rate, on cash balances awaiting disbursement or prior to such balances being swept into a cash sweep vehicle); and

- the percentage of the interest generated by its clients' cash in the Cash Sweep Programs that it retained for itself and its affiliates.

108. Charles Schwab exercised this *de facto* control by (i) automatically selecting and placing client funds into the Cash Sweep Programs of Charles Schwab's choice, (ii) setting the interest rates clients received and the portion of the interest generated by its clients' cash that it retained for itself and its affiliates, (iii) selecting its affiliated banks as the default banks to which its client cash was swept, and (iv) determining client eligibility for the Cash Sweep Programs.

109. Charles Schwab's "discretion" over its Cash Sweep Programs confirms its control over those programs and the fiduciary nature of the relationship between Defendants and their clients with respect to their Cash Sweep Program accounts.

110. Because Charles Schwab's Cash Sweep Program clients specifically entrusted these duties to Charles Schwab, and in its capacity as an adviser, broker, and/or agent in exercising complete control in creating, offering, automatically enrolling, maintaining, and managing cash sweep accounts under the Cash Sweep Programs and the rates to be paid thereunder, Charles Schwab assumed fiduciary and other duties of loyalty and care to its clients.

38

### 5.    Charles Schwab Was Obligated to Put Its Clients' Interests Before Its Own and Mitigate Any Potential Conflicts of Interest

111.    In addition to the fiduciary, contractual, and other legal obligations Charles Schwab owed to its clients set forth above, Charles Schwab possesses an additional obligation to put its clients' interests before its own and to mitigate any potential conflicts of interest.  Specifically, Charles Schwab publishes a Charles Schwab & Co., Inc. Investment Adviser Code of Ethics (the "Adviser Code"), which "applies to all CS&Co. employees, any individuals registered with CS&Co. as Investment Adviser Representatives ("IAR"), or other persons identified by the Investment Adviser Chief Compliance Officer ("CCO"), or designee who are considered 'Supervised Persons' under the Advisers Act."[9]

112.    Under a subsection titled "Standard of Conduct and Compliance with Laws, Rules and Regulations," the Adviser Code states, "[t]he Adviser Code is based upon the principle that Supervised Persons owe a fiduciary duty to their clients to conduct their affairs in such a manner as to (i) avoid serving their own personal interests ahead of clients, (ii) avoid taking inappropriate advantage of their position with the company and (iii) avoid, and, where appropriate, mitigate any actual or potential conflicts of interest or any abuse of their position of trust and responsibility."

113.    In addition, Charles Schwab's Code of Business Conduct and Ethics in effect throughout the Class Period stated:

> If you provide our clients with financial advice or investment advice or suggest, recommend, sell, or solicit interest in our products or services, you must do so in a fair, transparent manner. This includes:
> - ***Offering products and services that are aligned with the client's best interest . . . .***

---

[9] References to the Code of Ethics are to the document entitled "Charles Schwab & Co., Inc. Investment Advisor Code of Ethics," *available at*: https://www.schwab.com/legal/investment-advisor-code-of-ethics.

39

You should never:

- *Direct a client to an inappropriate or unnecessary product or service to receive or be considered for any incentive compensation or other credit . . . .*

114. The Adviser Code and Code of Business Conduct and Ethics thus prescribe that Charles Schwab avoid the conflict of interest presented by the Cash Sweep Programs, particularly in view of its fiduciary status vis-à-vis Plaintiffs and the proposed Class as to the Cash Sweep Programs.

### 6.    Charles Schwab's Contracts Have an Implied Covenant of Good Faith and Fair Dealing for Charles Schwab to Provide Clients with a Reasonable Rate of Interest

115. Each of Charles Schwab's clients' agreements concerning the Cash Sweep Programs—all of which were governed by California law—included an implied covenant of good faith and fair dealing.  This implied covenant includes, but is not limited to, a duty not to do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

116. In this case, that implied covenant included a duty for Charles Schwab to consider prevailing interest rates, such that its clients would obtain a fair and reasonable rate of interest on their cash sweep balances, and not to retain for itself and its affiliates the fruits of the contract governing the Cash Sweep Programs. Charles Schwab evaded the spirit of the bargain by paying a rate of interest that was so low as to be unreasonable in comparison to prevailing rates, and retaining for itself and its affiliates the vast majority of the interest generated by its clients' cash.

## V.    TD AMERITRADE'S SWEEP MISCONDUCT

### A.    The TD Ameritrade Insured Deposit Account ("IDA") Program

117. Prior to TD Ameritrade's acquisition by Charles Schwab, TD Ameritrade maintained its own cash sweep program, with its parent and affiliate TD Bank holding most of the accounts into which TD Ameritrade clients' cash was

deposited.  As set forth above, Plaintiffs Davis, Loughran, and Saunders were TD Ameritrade clients throughout the Class Period until the acquisition and transfer of each of their accounts to Charles Schwab in September 2023.

118.  Specifically, TD Ameritrade offered its clients a program it called the "Sweep Program" whereby cash in eligible TD Ameritrade accounts was automatically "swept" into one of several options ("Sweep Choices").  Those Sweep Choices include the TD Ameritrade FDIC Insured Deposit Account ("IDA") option, the "TD Ameritrade Cash" option, or the "Money Market Funds" option.  At issue in this case is the "IDA" Sweep Choice which is referred to herein as the "TD Sweep Program."   The "TD Ameritrade Cash" and "Money Market Funds" options are *not* at issue in this litigation.

119.  TD Ameritrade clients were automatically placed into the IDA as the "Designated Sweep Vehicle" when setting up a TD Ameritrade account.  In fact, clients had to affirmatively select an alternative—i.e., the "Money Market Funds" or "TD Ameritrade Cash" options—in order to avoid TD Ameritrade's default, the IDA.[10]

120.  Importantly, TD Ameritrade's disclosures suggested that these two alternatives—i.e., the "Money Market Funds" or "TD Ameritrade Cash" options— were not appropriate investments or, at minimum, were less desirable than the IDA. For instance, TD Ameritrade informed clients that by enrolling in the IDA, they would receive "up to $500,000 in FDIC insurance per depositor." In contrast, TD Ameritrade informed clients that the "TD Ameritrade Cash Feature is . . . not

---

[10] From the beginning of the Class Period until at least March 2021, the IDA was the designated default, and so-called sweep "Choice" selected for clients. While the IDA generally remained the default sweep option after that time, TD Ameritrade thereafter required that clients maintain assets with a "minimum market value of $50,000 . . . to be eligible for the IDA Feature" and that, if the balance fell below this amount, the cash would be transferred to the TD Ameritrade Cash feature.

41

guaranteed by any bank, and is not insured by the FDIC." Similarly, TD Ameritrade stated that the Money Market Funds "are not insured or guaranteed by the FDIC, any other government agency, or [TD Ameritrade], and there can be no assurance that such funds will be able to maintain a stable net asset value of $1 per share." Moreover, until at least July 2021, TD Ameritrade's "Summary of Cash Features Program" disclosure singled out TD Ameritrade Cash as "intended as a place to keep your cash pending investment and not solely for the purpose of receiving interest."

121.    The TD Sweep Program swept client cash into interest-bearing deposit accounts at one or more "Program Banks" that were either affiliated with TD Ameritrade, or to whom TD Ameritrade was contractually bound to channel its clients' money.  Two of those banks included TD Bank and TD Bank USA, both affiliates of TD Ameritrade.  In addition, following Charles Schwab's 2020 acquisition of TD Ameritrade, the Charles Schwab Banks (defined above) were added to the TD Sweep Program.  The Charles Schwab Banks and TD Banks are referred to collectively as the "TD Affiliated Banks."

122.    According to the Client Agreement, the Program Banks were the exclusive option for cash swept into IDAs pursuant to the TD Sweep Program, and TD Ameritrade primarily directed accounts participating in the TD Sweep Program to its affiliated banks.

123.    Under the TD Sweep Program, TD Ameritrade, acting as its clients' agent, opened one or more accounts on its clients' behalf at the Program Banks, including the TD Affiliated Banks.  Further, TD Ameritrade, in its discretion and acting as its clients' agent, selected the Program Banks, determined the order of the Program Banks in the IDA for the purposes of accepting funds based on several factors including, but not limited to, minimum and maximum balances agreed to with a particular Program Bank and the contractual arrangement between TD Ameritrade and a particular Program Bank.  TD Ameritrade also acted as the clients' agent in investing and redeeming balances in the Sweep Program.

42

124.   While TD Ameritrade acted as its clients' agent with respect to all features of the TD Sweep program, interest rates paid to TD Ameritrade clients under the TD Sweep Program were set at the discretion of TD Ameritrade, and the rates paid by each of the Program Banks were the same.  For example, the 2018 TD Ameritrade Client Agreement provides that the client will earn interest on deposits in the IDAs in accordance with the rates or tiered rates available as determined by TD Ameritrade, and that interest will be paid consistent with the rate or tiered rate made available to clients regardless of which Program Bank holds the clients' cash.

125.   A 2021 Summary of the TD Ameritrade Cash Features Program (which was described in similar disclosures throughout the Class Period) provides that, with respect to the IDA:

> **Insured Deposit Account.** You will earn interest on your deposits in the IDA in accordance with the rates or tiered rates available to you, as determined by TD Ameritrade. You understand that rates may vary based on the particular offering or the level of your assets held with TD Ameritrade. Interest rates earned in the IDAs will vary over time, but will be paid consistent with the rate or tiered rate TD Ameritrade makes available to you regardless of which Program Bank holds your cash. *The interest rates paid with respect to the IDAs may be higher or lower than the interest rates available to depositors making deposits directly with the Program Banks or other depository institutions in comparable accounts*.

126.   The 2021 Summary further provides that, under the TD Ameritrade Cash option, TD Ameritrade similarly "establishes the interest rate paid on the uninvested cash in your brokerage account…based on prevailing market and business conditions."

127.   Under the TD Sweep Program, the Program Banks profited from the "spread" between the *de minimis* rates they set for their clients and the interest they earned on current and new lending activities and investments.

128.   For example, the March 2021 TD Ameritrade Client Agreement stated that:

43

The Program Banks use IDA balances to fund current and new investment and lending activity. The Program Banks seek to make a profit by achieving a positive spread between their cost of funds (for example, deposits) and the return on their assets, net of expenses. [TD Ameritrade] receive[s] a volume-based fee from the Program Banks that are not affiliated with TD Ameritrade that ranges from 0.85% to 1.20%. In the case of Program Banks that are affiliates, [TD Ameritrade] will receive a fee of up to $100 per account. [TD Ameritrade has] the right to waive all or part of this fee. The rate of the fee that [TD Ameritrade] receive[s] may exceed the interest rate or effective yield that I receive in my balances in the IDAs, and the payment of the fee reduces the yield that I receive. Other than the applicable fees charged on brokerage accounts, there will be no charges, fees, or commissions imposed on my Account for this Sweep Choice. The current IDA interest rate will be disclosed on [TD Ameritrade's] website and may be changed without prior notice.

129. Thus, under the arrangement governing the TD Sweep Program, TD Ameritrade set the interest rate its clients received, and each client received the same rate regardless of which bank—affiliated or unaffiliated—held the client's cash. TD Ameritrade's Affiliated Banks (including the Charles Schwab Banks following the acquisition of TD Ameritrade by Charles Schwab) then pocketed the difference between the artificially low percentage TD Ameritrade sets for its clients and the interest that the Affiliated Banks earned by lending out clients' deposits. TD Ameritrade further profited from the fees paid by the unaffiliated banks to earn that "spread" for themselves.

130. In the Customer Relationship Summaries ("CRS"), including as amended on January 20, 2021, TD Ameritrade acknowledges its legal obligation to its clients that "[w]hen we provide you with a recommendation as your broker-dealer or act as your investment advisor, we have to act in your best interest and not put our interest ahead of yours." The CRS then sets forth examples of the types of "recommendations" TD Ameritrade might make that give rise to a conflict of interest. Included in those examples were the conflicts inherent in the

44

recommendation to clients to use the IDA.  For example, a CRS during the Class Period stated:

> **At the same time, the way we make money creates some conflicts with your interests. You should understand and ask us about these conflicts because they can affect the recommendations we provide you. Here are some examples to help you understand what this means**:
>
> We generally sweep cash in our retail customer accounts into an insured bank deposit account held at one or more Program Banks as an account feature. The Program Banks pay us a marketing fee based on a percentage of the amount of our customer deposits with them that ranged from 1.3 to 1.7% annually in 2019. *So we have a financial incentive to send customer cash to the Program Banks*, and you receive a lower yield than if they didn't pay us a marketing fee. Please note that certain Schwab banks will be added to the Program Banks in March 2021.

(Bolded italics added.)

131.    Thus, TD Ameritrade's CRS demonstrates that TD Ameritrade itself considered its provision of the IDA cash sweep "Choice" to be a "recommendation" subject to its duties as a broker-dealer and as investment adviser, including under Reg. BI.

## B.    TD Ameritrade's Agreements With Its Clients

132.    The relationships among TD Ameritrade and all its brokerage accountholders, including retirement (traditional IRA or Roth IRA accounts) and non-retirement accountholders, and investment advisory clients, including Plaintiffs, are set forth in a series of agreements, disclosures and supplements thereto.

133.    To start, in order to establish a brokerage or advisory relationship with TD Ameritrade, each class member executed an account application.  As part of that application, class members had to agree to the Client Agreement.  Indeed, the application states that "before we can open your account, you must read and electronically sign the TD Ameritrade Client Agreement," and by signing the

45

application, class members affirm that they are "accepting and agreeing to abide by all of the Client Agreement."

134.    As further described herein, the terms of the TD Sweep Program are contained in each respective "Client Agreement" that Class members executed upon account opening, as well as other disclosures described herein. The Client Agreement specifically includes "any supplemental agreements and disclosures that apply to my Account, as amended from time to time."

135.    Those agreements make clear that TD Ameritrade and its affiliates owe duties and obligations to their clients in connection with the TD Sweep Program. The Client Agreement provides that "'TD Ameritrade' means TD Ameritrade, Inc., a wholly owned subsidiary of TD Ameritrade Holding Corporation, and, when applicable, TD Ameritrade Clearing, Inc. ('Clearing'), TD Ameritrade's clearing broker-dealer," and that "You" refers to "TD Ameritrade."[11]  The Client Agreement further notes that TD Bank and TD Bank USA are affiliated companies under the common control of TD Ameritrade.

136.    The Client Agreement governs all TD Ameritrade accounts, other than accounts opened with the TD Ameritrade Institutional Division, which are discussed below.  The Client Agreement provides detail about the TD Sweep Program and further establishes that TD Ameritrade acts as an agent for its clients with respect to the TD Sweep Program.  That agency relationship gives rise to a fiduciary relationship between itself and TD Ameritrade clients—i.e., Plaintiffs and the members of the Class.

137.    The application for a TD Ameritrade account asks clients to designate a Sweep Choice.  Class members who did not select a Designated Sweep Vehicle

---

[11] The Client Agreement for the TD Ameritrade Institutional Division specifically identifies the TD Ameritrade Institutional Division of TD Ameritrade, Inc., as well as "Clearing," when defining "TD Ameritrade."

were assigned the IDA as their Designated Sweep Vehicle. For example, the TD Ameritrade Client Agreement states:

> **Sweep Program.** My available cash may be swept into a sweep vehicle pending investment of the cash. The alternatives available under the Sweep Program are referred to as "Sweep Choices," and the one I select is referred to as the "Designated Sweep Vehicle." You will notify me of the Sweep Choices and the Designated Sweep Vehicle. I agree that at account opening my Designated Sweep Vehicle will be the TD Ameritrade FDIC Insured Deposit Account (described below), unless I select a different Sweep Choice.

138. A related disclosure document, "Summary of Cash Sweep Program," also states that the IDA "serves as the primary cash sweep vehicle for earning income on cash balances in TD Ameritrade brokerage accounts and is the default cash sweep vehicle unless you make an alternate sweep election."

139. By agreeing to the Client Agreement, clients authorized TD Ameritrade to "***act as [their] agent in depositing funds into the IDAs and withdrawing funds from the IDAs.***" TD Ameritrade is also responsible for maintaining records for clients evidencing ownership of the IDAs, handling issues related to unauthorized activity in the IDAs, and addressing any complaints regarding the IDAs at the Program Banks. The Client Agreement states:

> ***I authorize you to act as my agent*** to purchase and redeem balances in the Designated Sweep Vehicles, and authorize you to select and use agents as you deem appropriate.

140. As an agent for its brokerage clients with respect to the TD Sweep Program, TD Ameritrade "determine[s] the order of the Program Banks in the IDA for the purposes of accepting deposits based on several factors including, but not limited to, minimum and maximum deposit balances agreed to with a particular Program Bank and the contractual arrangement between [TD Ameritrade] and a particular Program Bank." TD Ameritrade also retained the power to terminate the use of the IDA sweep feature at any time.

47

141.    Additional language in the Client Agreement supports the existence of an agency relationship between TD Ameritrade and its clients with respect to the TD Sweep Program, and the limitations that clients have over their accounts:

- "In addition, savings accounts *you hold as agent for me* at a Program Bank have transfer limits…"

- "*[Client] may not change the Program Banks*, the order in which funds are deposited into the Program Banks, or the maximum deposit amount at any Program Bank."

- "*[TD Ameritrade] may change the eligibility criteria* or replace the Sweep Choices available to me."

## C.    The Plaintiffs' Relationships with TD Ameritrade

142.    Ms. Loughran had been a client of TD Ameritrade since at least September 2015 and was enrolled in the IDA during the Class Period until her account was transitioned to Charles Schwab in September 2023.

143.    Mr. Saunders had been a client of TD Ameritrade since no later than June 2013, until his account was transitioned to Charles Schwab in September 2023. Mr. Saunders executed a Third-Party Investment Management Program Managed Account Application ("Managed Account Application"), attached to a Third-Party Investment Management Program Management Account Agreement ("Managed Account Agreement") with TD Ameritrade, on March 6, 2013.  As set forth in Section 5 of the Managed Account Application, Mr. Saunders opened a Traditional IRA account. Under Section 15 of the Managed Account Application, "Cash Sweep Vehicle Choices," Mr. Saunders enrolled in the IDA.  Section 15 of the Managed Account Application referred Mr. Saunders to the "Client Agreement for a complete description of the Cash Sweep program."  Section 19 of the Managed Account Application stated that Mr. Saunders also agreed "to be bound by the 'Client Agreement' which may be amended from time to time and which is incorporated by

this reference." From June 2013 until September 2023, Mr. Saunders' account statements reflected his continued enrollment in the IDA.

144. Mr. Davis had been a client of TD Ameritrade since at least August 2006, when he received a letter from TD Ameritrade informing him that as of September 23, 2006, he would be automatically enrolled in a Money Market Deposit Account cash sweep. On June 3, 2022, TD Ameritrade informed Mr. Davis that his previous money market fund sweep was being discontinued as an eligible cash sweep option for brokerage accounts such as his, and that he would instead be enrolled in the IDA "[o]n or around July 3, 2022." Mr. Davis remained enrolled in the IDA until his accounts were transitioned to Charles Schwab on September 1, 2023.

145. Because each member of the Class, including Plaintiffs, were parties to the Client Agreement that incorporated TD Ameritrade's subsequent disclosures, each Class member's agreement with TD Ameritrade incorporated throughout the Class Period each successive iteration of the disclosures referenced herein, including, among others, the Summary of Cash Sweep Program and the Form CRS Customer Relationship Summary, during the periods of time in which they were operative. As described below, in those agreements, TD Ameritrade promised that it would act in its clients' best interest and not put TD Ameritrade's interest ahead of its clients'.

**D. TD Ameritrade Owed Fiduciary Duties as an Agent in Establishing and Maintaining the IDA**

146. Through its control and discretion over, and management and operation of, the IDA, TD Ameritrade had an agency relationship with Plaintiffs and other members of the Class, and therefore assumed fiduciary duties including the duty of loyalty, the duty of care, the duty to act in good faith, and the duty to make prudent investment recommendations. These fiduciary duties are meant to always ensure TD Ameritrade acts with integrity and in the best interests of its clients.

147.  TD Ameritrade specifically acknowledged its duties as an agent (and therefore a fiduciary) in establishing, maintaining and operating the TD Sweep Program.  As set forth above, TD Ameritrade acted as its clients' agent and exercised complete control over the selection of the Program Banks, the establishment and operation of the TD Sweep Program, including the establishment of rates to be paid to all clients, its discretion to change or terminate the TD Sweep Program, the authority to purchase and redeem balances in the Designated Sweep Vehicles, and the authority for TD Ameritrade to select and use agents as it deemed appropriate. For example, the Client Agreement stated: "I authorize [TD Ameritrade] to automatically withdraw cash or redeem securities maintained in a Designated Sweep Vehicle to satisfy my obligations. I authorize [TD Ameritrade] *to act as my agent to purchase and redeem balances in the Designated Sweep Vehicles*, and authorize you to select and use agents as you deem appropriate."

148.  The Client Agreement also provided TD Ameritrade additional discretion as Plaintiffs' agent concerning the IDAs.  For example, it stated that "All withdrawals necessary to satisfy debts in my Account will be made by [TD Ameritrade], *as my agent*[,]" and that "[TD Ameritrade] *will act as my agent in depositing funds into the IDAs and withdrawing funds from the IDAs*."

149.  In other words, TD Ameritrade's clients specifically entrusted TD Ameritrade to carry out and operate the TD Sweep Program as an agent—and thus fiduciary—through which TD Ameritrade exercised complete control in creating, offering, enrolling, and maintaining the TD Sweep Program and the cash sweep accounts and the rates paid thereunder.  Contrary to its fiduciary duties of loyalty and care to act as its clients' agent and fiduciary in connection with the TD Sweep Program, TD Ameritrade acted to advance its own interests, and those of its affiliates, at the expense of its clients.

**E.    TD Ameritrade Owed Duties to Act in Its Clients' Best Interest**

150.    In addition to acting with fiduciary duties of loyalty and care imposed by its agency relationship, TD Ameritrade's fiduciary and other duties were also informed by its obligations as a broker-dealer under SEC Rules.  For example, the operative Client Agreement during the Class Period incorporated by reference "Applicable Rules," defined as "all applicable federal (for example, SEC, ERISA and Internal Revenue Code) and state laws, rules and regulations, rules of any self-regulatory organization, and the constitution and applicable rules, regulations, customs, and usages of the exchange or market and its clearinghouse."

151.    The Client Agreement further acknowledged that TD Ameritrade received transaction and other fees through the operation of the TD Sweep Program "*to the extent permitted by Applicable Rules*."  Like Charles Schwab, the "Applicable Rules" included TD Ameritrade's obligations to comply with Reg. BI in the operation and recommendation of the IDA.  Those duties included the obligation to "consider reasonable alternatives, if any, offered by the broker-dealer in determining whether it has a reasonable basis for making the recommendation," 84 Fed. Reg. 33318, 33321—including with respect to whether a particular cash sweep program aligns with the best interests of the client.  *See* Regulation Best Interest:  The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33318 (July 12, 2019), 17 C.F.R. §240.151-1.

152.    As noted above, the SEC has made clear that TD Ameritrade's obligations as a broker-dealer under Reg. BI required it to act in a "retail investor's best interest and not to place their own interests ahead of the investor's interest"; to "recommend an account to a retail investor only when [TD Ameritrade had] a reasonable basis to believe that the account is in the retail investor's best interest"; that TD Ameritrade "cannot recommend an account that is not in a retail investor's best interest solely based on [TD Ameritrade's] limited product menu"; "[a]ny limitations on account types considered . . . are material facts that should be

51

disclosed"; and that TD Ameritrade was required to disclose any compensation it received on the basis of its cash sweep program.

153.    TD Ameritrade also acknowledged its duties as a broker-dealer and thus its obligations under Reg. BI in other account agreements and disclosures.  For example, in TD Ameritrade's CRS, TD Ameritrade stated that "TD Ameritrade, Inc. (TDA, we, our or us) is registered with the Securities and Exchange Commission (SEC) as both a broker-dealer and an investment advisor and is a member of the Financial Industry Regulatory Authority (FINRA) and the Securities Investor Protection Corporation (SIPC)."  The CRS further stated that "[w]hen we provide you with a recommendation as your broker-dealer or act as your investment advisor, we have to act in your best interest and not put our interest ahead of yours."

154.    Specifically, the CRS set forth TD Ameritrade's legal obligations:

When we provide you with a recommendation as your broker-dealer or act as your investment advisor, *we have to act in your best interest and not put our interest ahead of yours*. At the same time, the way we make money creates some conflicts with your interests. *You should understand and ask us about these conflicts because they can affect the recommendations we provide you*. Here are some *examples* to help you understand what this means:

•    We generally sweep cash in our retail customer accounts into an insured bank deposit account held at one or more Program Banks as an account feature. The Program Banks pay us a marketing fee based on a percentage of the amount of our customer deposits with them that ranged from 1.3 to 1.7% annually in 2019. *So we have a financial incentive to send customer cash to the Program Banks, and you receive a lower yield than if they didn't pay us a marketing fee.* Please note that certain Schwab banks will be added to the Program Banks in March 2021.

155.    In the CRS, TD Ameritrade used the TD Sweep Program as an example of "a recommendation as your broker-dealer," making clear that it owed obligations to clients to act in their best interests in doing so.

52

**F.    TD Ameritrade Owed Additional Fiduciary Duties as An Investment Adviser**

156.    In addition to its duties as an agent and under Reg. BI, TD Ameritrade also owed fiduciary duties to its clients as an investment adviser.  Specifically, TD Ameritrade Investment Management ("TDAIM") was a registered investment adviser with the SEC, and an affiliate of TD Ameritrade, that provided investment advisory services to TD Ameritrade clients enrolled in the TD Sweep Program. Following the acquisition of TD Ameritrade by Charles Schwab, TDAIM and TD Ameritrade became wholly-owned subsidiaries of The Charles Schwab Corporation. TDAIM offered "investment advisory services primarily to retail investors, including goal-planning and investment management."

157.    TDAIM's provision of investment advisory services was governed by the TDAIM Service Agreement, as well as the TDAIM Form ADV Part 2A disclosure brochure. The TDAIM Service Agreement stated that it "shall be construed in conjunction with and be subject to the terms and conditions of the TD Ameritrade Client Agreement between you and TD Ameritrade."

158.    According to the TDAIM Service Agreement, dated April 2022, advisory clients' cash in nontaxable accounts was automatically swept into the IDA. Specifically, the TDAIM Service Agreement stated:

> TDAIM will place uninvested cash in your [account] into a cash sweep vehicle. We will also maintain a portion of your portfolio in cash. The cash buffer ensures the availability of our advisory fee and provides liquidity to cover potential price changes in market orders. In taxable accounts, the cash sweep vehicle is the TD Ameritrade FDIC Insured Deposit Account ("IDA") provide by one or more banks ("Program Banks").

TDAIM's automatic maintenance of a portion of advisory client funds in cash, and its automatic enrollment of clients into the IDA constituted investment advice. TDAIM also charged an advisory fee for "cash held within the portfolio strategy," i.e., the cash that TDAIM was automatically sweeping into the IDA.

53

159.    When TD Ameritrade acted through TDAIM as a client's investment adviser, it was required to act in the client's best interest and owed fiduciary duties of loyalty and care.  TDAIM acknowledged these fiduciary duties applied to its recommendation of the IDA and TD Ameritrade's operation of the IDA in the CRS agreement, stating:

> ***When we act as your investment advisor, we have to act in your best interest and not put our interest ahead of yours***. At the same time, the way we make money creates some conflicts with your interests. You should understand and ask us about these conflicts because they can affect the investment advice we provide you. Here are some examples to help you understand what this means.
>
> * * *
>
> •   For taxable accounts, the principal sweep vehicle TDAIM uses is an insured deposit account (IDA) held at one or more Program Banks. The Program Banks pay TDA a marketing fee based on a percentage of the amount of TDAIM client deposits with them, that ranged from 1.3 to 1.7% annually in 2019. So our affiliated broker TDA benefits financially from the deposits and you get a lower yield than if TDA wasn't paid a marketing fee. In addition, beginning in March 2021 certain Schwab banks will become IDA Program Banks.

160.    The Client Agreement further detailed how the Program Banks profited through the cash balances in client IDAs—and that this was a conflict with TD Ameritrade's fiduciary duties—stating:  "Program Banks use IDA balances to fund current and new investment and lending activity. The Program Banks seek to make a profit by achieving a positive spread between their cost of funds (for example, deposits) and the return on their assets, net of expenses."

## G.    TD Ameritrade Owed Additional Fiduciary Duties to Retirement Accountholders

161.    In addition to its obligations as an agent and under Reg. BI, TD Ameritrade owed additional fiduciary duties to retirement accountholders.  As set forth in the Client Agreement for the Institutional Division of TD Ameritrade (which contains most of the same rights and obligations as the non-institutional Client

Agreement), TD Ameritrade acknowledged that, with respect to retirement accountholders, TD Ameritrade acted as "a fiduciary of the Plan who is authorized to enter into contracts and invest Plan assets or acting at the direction of a Plan fiduciary who is so authorized."

162. This disclosure reflected the fact that TD Ameritrade assumed fiduciary obligations in exercising discretion over retirement assets. Specifically, TD Ameritrade's unique treatment of retirement assets through its fiduciary role reflects the fact that certain retirement accounts—IRAs—are subject to Section 4975 of the Internal Revenue Code ("IRC"), which taxes "prohibited transactions," including when a plan sponsor for an IRA engages in transactions with a "disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account." 26 U.S.C. § 4975(c).

163. A "disqualified person" includes companies or individuals "providing services to the plan"—i.e., an IRA. 26 U.S.C. § 4975(e)(1)(B).[12] This would include the Program Banks that receive deposits swept from TD Ameritrade accounts through the IDA.

164. The Internal Revenue Code provides several "exemptions" or safe harbors for these "prohibited transactions," one of which is "the investment of all or part of a plan's assets in deposits which bear *a reasonable interest rate* in a bank or similar financial institution." 26 U.S.C. § 4975(d)(4).

165. TD Ameritrade thus has both legal and contractual duties to act in the best interests of its IRA clients vis-à-vis the IDA and to pay "reasonable interest rates" on its clients' cash balances.

---

[12] A "Plan" is defined as including "an individual retirement account described in Internal Revenue Code § 408(a)," i.e., an IRA.

55

**H.    TD Ameritrade Was Obligated to Treat Its Clients Fairly and in Good Faith**

166.    In addition to the fiduciary, contractual, and other legal obligations TD Ameritrade owed to its clients set forth above, TD Ameritrade had an additional obligation to treat its clients fairly and in good faith.  Specifically, like Charles Schwab, TD Ameritrade adopted and published a "Code of Ethics, Participation, or Interest in Client Transactions and Personal Trading" ("Code") that applied to all TDAIM personnel.

167.    According to the Disclosure Brochure on Form ADV, Part 2A, dated February 26, 2018, the Code is "based on the fiduciary duty principle that clients' interests come first.  The Code requires TDAIM's personnel to adhere to high standards of honest and ethical conduct and, among other things, to comply with various reporting and approval requirements as to securities transactions."

168.    As alleged herein, TD Ameritrade repeatedly and systematically violated its own Code by and through the TD Sweep Program, which enriched TD Ameritrade at the expense of its clients.

**I.    TD Ameritrade Is Acquired by Charles Schwab**

169.    On November 25, 2019, Charles Schwab announced that it would acquire TD Ameritrade in an all-stock transaction valued at approximately $26 billion (the "TDA Acquisition").  For Charles Schwab, the TDA Acquisition meant that the company would acquire approximately 12 million accounts of TD Ameritrade clients, $1.3 trillion in client assets held by TD Ameritrade, and approximately $5 billion in annual revenue.  Post-closing, TD Bank, which at that time held approximately 43% of TD Ameritrade's common stock, was to have an estimated aggregate ownership position of approximately 13% in the combined company.  The combination benefitted both Charles Schwab and TD Bank, as the two institutions were able to pool client assets held in the two institutions' cash

sweep programs and use the larger aggregate cash balances to generate additional net interest income.

170. To carry out the transaction, the TDA Acquisition included a renegotiation by Charles Schwab and TD Bank of the "IDA Agreement," i.e., the agreement between Charles Schwab, TD Ameritrade, and TD Bank governing the cash sweep programs. As part of the consideration to be paid to TD Bank for the TD Ameritrade acquisition, Charles Schwab agreed to extend the IDA Agreement for a 10-year term beginning in 2021. In addition, the servicing fee paid by Charles Schwab on balances within the IDA was reduced by 10 basis points, i.e., from 25 basis points to 15 basis points, allowing Charles Schwab to reap even greater profits. In exchange, Charles Schwab agreed to direct and maintain a minimum amount of at least $50 billion of cash swept from its clients' accounts to TD Bank and TD Bank USA during the length of the agreement. Then, in 2023, the parties further renegotiated the IDA Agreement to require that Charles Schwab maintain a deposit balance of at least $60 billion with TD Bank and TD Bank USA after September 2025.

171. Pursuant to the IDA Agreement as amended November 24, 2019, the interest rate payable by TD Bank and TD Bank USA in the TD Sweep Program would be determined solely by its own Broker-Dealers, TD Ameritrade Clearing, Inc. and TD Ameritrade Trust Company.

172. That the transaction was intended to benefit Charles Schwab and TD Bank—but not Plaintiffs and the members of the Class who had funds in Defendants' cash sweep programs—was immediately apparent to market observers. Commenting on the transaction, the president of Fidelity's Personal Investing business said that "unfortunately for investors, the combination of Charles Schwab and TD Ameritrade means they will likely be doubling down on revenue practices

that directly disadvantage investors, including ***paying extremely low cash sweep rates*** [what it pays on cash in investment accounts]."[13]

173. On October 6, 2020, Charles Schwab announced that it had completed the acquisition, and TD Ameritrade became a wholly-owned subsidiary of Charles Schwab.

174. The integration of Charles Schwab's and TD Ameritrade's operations was expected to occur over the next 18 to 36 months. Until the integration was completed, Charles Schwab and TD Ameritrade continued to operate separate broker-dealers to serve their respective clients, and the products and services then currently available from the two companies remained largely unchanged.

175. Over the weekend of May 11-12, 2024, Charles Schwab successfully transitioned approximately 1.8 million remaining TD Ameritrade client accounts and about $350 billion in assets to Charles Schwab—i.e., the final remaining 10% of the total TD Ameritrade client population that had not yet been transitioned.

176. Following the final transition of all TD Ameritrade client accounts as part of the TDA Acquisition, Charles Schwab amended its Cash Features Program Disclosure Statement. In the amended disclosure statement, Charles Schwab disclosed that, instead of allowing flexibility on cash sweep options that may be in the best interests of its clients, it was contractually obligated to sweep some client cash to Affiliated Banks pursuant to the renegotiated Charles Schwab-TD Ameritrade IDAs:

> Schwab is contractually obligated to sweep some customer cash enrolled in the Bank Sweep feature to TD Bank and TD Bank, USA. Because as a contractual matter, the rates paid to Schwab customers for cash swept to TD Bank and TD Bank, USA is [sic] the same as the rates paid by the Schwab-affiliated Banks, we do not believe customers are materially affected by this practice, especially because any Schwab

---

[13] https://www.latimes.com/business/story/2019-11-25/la-fi-charles-schwab-buys-td-ameritrade.

customer bank deposits above FDIC insurance limits (no matter where the initial deposits are swept) are all swept to the same bank, Schwab Bank.

177.   By sweeping clients' cash into sweep accounts at the Affiliated Banks, Defendants took for themselves and their affiliates the vast majority of the compensation earned from its clients' cash at the expense of its clients and principals, who received only a minimal and unreasonable return on their cash balances.

## VI.   CHARLES SCHWAB AND TD AMERITRADE BREACHED THEIR DUTIES, CONTRACTS, AND THE IMPLIED COVENANT IN ORDER TO IMPROPERLY PROFIT FROM THEIR CLIENTS' SWEPT CASH

178.   Charles Schwab breached (i) its contractual agreements to pay a reasonable rate of interest based on prevailing rates, (ii) its agreements to avoid and/or take steps to mitigate its conflicts of interest so as to not interfere with clients receiving a reasonable rate of interest, (iii) its duty to put its clients' interests vis-à-vis the interest generated by their cash in the Cash Sweep Programs above its own interests, and (iv) the implied covenant to pay clients a reasonable rate of interest and not destroy the fruits of the bargain for its clients.

179.   TD Ameritrade breached its contractual agreements and corresponding implied covenant to: (i) set or pay fair or reasonable interest rates on clients' cash balances deposited in the TD Sweep Program; (ii) properly take into account industry, market or prevailing economic and business conditions in setting interest rates; and (iii) elevate its clients' interests above its own in creating, implementing, maintaining, recommending, and operating the TD Sweep Program.

180.   Charles Schwab and TD Ameritrade respectively breached such obligations by creating and operating the Cash Sweep Programs and TD Sweep Program for their own benefits—while exercising complete control over all aspects of the Programs—and by failing to pay or remit reasonable rates of interest on client

cash balances and retaining for themselves and their affiliates the vast majority of the interest generated by their clients' cash in the Cash Sweep Programs and TD Sweep Program.

181. By agreeing with their respective affiliated banks to set an artificially low rate to pay their clients and keeping the difference for themselves and/or benefitting themselves and the banks at the expense of their clients, Charles Schwab and TD Ameritrade breached their respective fiduciary duties and contractual and implied obligations to their clients, including to act as their agent and not for the Program Banks' benefit.

182. As a result of Charles Schwab and TD Ameritrade's self-interested misconduct in establishing, operating, and maintaining the Cash Sweep Programs and TD Sweep Program, respectively, Charles Schwab and TD Ameritrade clients received the same low rates on their cash balances in their Charles Schwab and TD Ameritrade accounts from all banks in the respective Cash Sweep Programs and TD Sweep Program. Specifically, Plaintiffs and the Class members received rates of a fraction of one percent, even as interest rates climbed dramatically to over 5% during the Class Period.

183. By setting and remitting these unreasonably low interest rates, Charles Schwab and TD Ameritrade and their affiliates retained the vast majority of the returns generated by their respective clients' cash balances.

184. Through their legal and contractual duties, Charles Schwab and TD Ameritrade were obligated, but failed, to: (i) set, secure or pay fair and reasonable interest rates on clients' cash balances deposited in the Cash Sweep Programs and TD Sweep Program based on prevailing interest rates or prevailing market, industry, or business conditions; or (ii) place their clients' interests above their own in creating, implementing, maintaining, recommending, and operating the Cash Sweep Programs and TD Sweep Program.

185.    Charles Schwab and TD Ameritrade's failures to pay to or secure for their clients a fair or reasonable rate of interest on their cash balances unjustly enriched Charles Schwab, TD Ameritrade, and their affiliates at the expense of their clients.    In doing so, Charles Schwab and TD Ameritrade reaped hundreds of millions (if not billions) of dollars in profit for themselves at their clients' expense.

186.    The interest rates paid to clients pursuant to the Cash Sweep Programs and TD Sweep Program were established by Charles Schwab and TD Ameritrade, respectively.    Contrary to Charles Schwab's contractual and fiduciary obligations, Charles Schwab paid unreasonably low rates of interest on clients' swept cash that were not "consistent with their views of prevailing market and business conditions," that were not "reasonable rate[s]" of interest, "consistent with applicable legal and regulatory requirements" for retirement accounts, and that failed to put clients' interests ahead of its own.    Likewise, TD Ameritrade paid unreasonably low rates contrary to its contractual, implied, and fiduciary obligations to pay a reasonable rate of interest and properly take into account the industry, market, or prevailing economic and business conditions.

187.    For example, since 2022, the Federal Funds Rate—the interest rate at which banks lend to one another—increased significantly from a low of 0.08% to a high of 5.33% in 2024.    However, Charles Schwab and TD Ameritrade both failed to secure and pay a corresponding increase on the interest rates on their respective clients' swept cash.    In fact, Charles Schwab and TD Ameritrade both maintained exceedingly low rates for years, at a fraction of a percent, and retained the sharply increased spread for themselves. This is reflected in the graph below, which compares the Federal Funds Rate to Charles Schwab's Cash Sweep Program interest

61

rate for its lowest asset tier and TD Ameritrade's TD Sweep Program interest rate for its lowest asset tier.



188.    As this graph illustrates, Charles Schwab and TD Ameritrade both derived significant profits from having their respective clients' funds invested in the Cash Sweep Programs and TD Sweep Program, respectively, because Charles Schwab and TD Ameritrade established rates to be paid to their clients that are neither fair nor reasonable—contrary to their legal, contractual, and implied duties. Moreover, the revenue that Charles Schwab and TD Ameritrade, respectively, received in net interest income constituted excessive windfalls, reaped from their clients' holdings.

189.    The table below provides examples of the artificially low rates paid through Charles Schwab's Cash Sweep Programs in each of the previous six years:

| Charles Schwab's Rates for the Cash Sweep Programs | | | | | | |
|---|---|---|---|---|---|---|
| Deposit Balance | 2019 | 2020 | 2021 | 2022 | 2023 | 2024[14] |
| $1 - $999,999 | 0.05 | 0.01 | 0.01 | 0.45 | 0.44 | 0.05 |
| > $1,000,000 | 0.29 | 0.01 | 0.01 | 0.45 | 0.44 | 0.05 |

190.   The table below provides examples of the artificially low rates paid through the TD Sweep Program in each of the previous six years:

| TD Ameritrade's Rates for the Sweep Program[15] | | | | | | |
|---|---|---|---|---|---|---|
| Deposit Balance | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| $1 - $99,999 | 0.015 | 0.01 | 0.01 | 0.29 | 0.34 | 0.34 |
| $100,000 - $199,999 | 0.02 | 0.01 | 0.01 | 0.29 | 0.34 | 0.34 |
| $200,000 - $499,999 | 0.03 | 0.01 | 0.01 | 0.29 | 0.34 | 0.34 |
| $500,000 - $999,999 | 0.045 | 0.01 | 0.01 | 0.29 | 0.34 | 0.34 |
| > $1,000,000 | 0.265 | 0.01 | 0.01 | 0.29 | 0.34 | 0.34 |

191.   In December 2024, Charles Schwab lowered its cash sweep interest rate to 0.05%—a decline totally untethered to the "prevailing market or business conditions."  Rather, as described by journalists and industry observers in a January 8, 2025 *RIABiz* article, the reduction capped "an astonishing series of payout reductions that had previously bypassed the media" and represented a "big tactical gamble" by Charles Schwab to "raise revenues by paying investors much less on sweep cash without losing clients or inviting more lawsuits."

192.  Charles Schwab and TD Ameritrade derived significant financial benefits for themselves and their affiliates from the payment of unreasonably low

---

[14]Rates and fees for each year reflect the last observed rate for each year.

[15] Rates for 2024 are as of May 12, 2024, when Charles Schwab completed transition of the remaining TD Ameritrade client accounts to Charles Schwab.  Rates and fees for each previous year reflect the last observed rate for each year.

interest rates on their clients' cash sweep deposits.  The Program Banks made it possible for Charles Schwab and TD Ameritrade to take advantage of the nearly cost-free cash entrusted to them by their clients pursuant to the Cash Sweep Programs and TD Sweep Program, and retaining for themselves the vast majority of the profits generated by their clients' cash deposits.

### A.    Sweep Account Rates Paid by Other Institutions

193.    The interest rates paid by other brokerages that sweep cash similarly demonstrate that the interest rates paid by Charles Schwab to its cash sweep accountholders were not "reasonable," and that Charles Schwab did not set rates consistent with "prevailing market and business conditions."  Those rates paid by other brokerages similarly demonstrate that TD Ameritrade did not pay rates to its clients that were fair or reasonable, and that TD Ameritrade did not set rates that properly took into account the market, industry, or prevailing economic and business conditions. This includes brokerages that sweep cash to a bank that is not affiliated with the brokerage, such as Fidelity Investments.

194.    As shown in the graph below, an index of interest rates paid by five brokerages that did *not* sweep client cash balances to a bank affiliated with its own brokerage more closely tracks the movement of the Federal Funds Rate (set forth above) than Charles Schwab and TD Ameritrade's respective *de minimis* interest rates for the Cash Sweep Programs and the TD Sweep Program.  By contrast, the respective interest rates that Charles Schwab and TD Ameritrade paid their clients were much lower during much of the relevant time:



195.   As shown in the above graph, from late 2018 to 2024, Charles Schwab's sweep rates were consistently below the sweep rates paid by brokerages using unaffiliated banks, while TD Ameritrade's sweep rates had no movement and remained at 0.45% or less, even as those comparative rates increased sharply during 2018 and 2019 and remained much higher than Charles Schwab and TD Ameritrade's respective rates in mid-2022 through the present.  In addition, starting in mid-2022, Charles Schwab's sweep rate stayed consistently low with small increases, and TD Ameritrade's sweep rates stayed at 0.34% or less from mid-2022 to the present, while the rates paid by brokerages that swept cash to unaffiliated banks increased significantly.

196.   Specific brokerage firms that swept cash to unaffiliated banks paid interest rates that more closely resembled arm's-length negotiations, and therefore at least partially reflected the prevailing rates and market conditions, compared to the respective rates paid by Charles Schwab and TD Ameritrade.  For example:

- Currently, the interest rate offered by The Vanguard Group, Inc. on its sweep program is 3.65% regardless of asset tier.

- As of January 2024, Fidelity Investments paid 2.72% interest on

65

cash balances regardless of asset tier.

- As of year-end 2022, Fidelity Investments paid 2.21% interest on cash balances regardless of asset tier.

197. A comparison between Charles Schwab and TD Ameritrade's respective sweep account interest rates paid in the Cash Sweep Programs and the average of the rates in an industry-wide analysis of 300 sweep programs also shows that Charles Schwab and TD Ameritrade's respective rates were unreasonably low during the Class Period, and that Charles Schwab and TD Ameritrade did not base their respective sweep interest rates on prevailing interest rates, the market, industry, or "business and economic conditions." During 2023 and 2024, the index was up to 4.44 times greater than the rates Charles Schwab and TD Ameritrade paid.

198. The average of the rates in the industry-wide index of 300 sweep programs are *conservatively low* comparators because: (i) they represent the averages across many brokerages, some paying reasonable rates, and some not; (ii) other comparators are more appropriate, including when one compares Charles Schwab or TD Ameritrade to brokerages that sweep to unaffiliated banks (as set forth above); and (iii) fact and expert discovery will examine and address the appropriate comparators, Charles Schwab and TD Ameritrade's respective interest rate methodologies, and what experts opine was the reasonable rate.

199. As these data show, other brokerage and advisory financial institutions that have cash sweep programs pay significantly higher rates than Charles Schwab and TD Ameritrade did for their own respective clients.

**B.    The Federal Funds Rate Benchmark**

200. A number of interest rate benchmarks increased significantly over the past several years, but Charles Schwab and TD Ameritrade's interest rates remained largely unchanged.

201. The Federal Funds Rate benchmark further demonstrates that the interest rates paid to Charles Schwab Cash Sweep Programs' accountholders were

66

not "reasonable" and did not approximate the result of arm's-length negotiations. Similarly, the Federal Funds Rate benchmark illustrates how the interest rates paid to TD Sweep Program accountholders were not fair or reasonable and did not properly consider the market, industry, or prevailing economic and business conditions. The federal funds market consists of domestic unsecured borrowings by depository institutions from other depository institutions and certain other entities, primarily government-sponsored enterprises. In other words, it is the market of unsecured borrowing transactions, principally between banks. The effective Federal Funds Rate is calculated as a volume-weighted median of such overnight federal funds transactions.

202. The Federal Funds Rate increased significantly in recent years. For example, the effective Federal Funds Rate on August 28, 2024 was 5.33% and the effective Federal Funds Rate on March 20, 2025 was 4.33%. The graph below shows the Federal Funds Rate since 2018 and the respective rates paid on the Charles Schwab and TD Sweep Program on deposits in the lowest asset tiers for Charles Schwab and TD Ameritrade's clients. As the comparison shows, the respective interest rates paid to Charles Schwab and TD Ameritrade cash sweep accountholders have been drastically lower and have failed to reflect changes in the economy:

Charles Schwab and TD Ameritrade Sweep Rate vs. Federal Funds Rate

203. The above graph demonstrates that the respective interest rates Charles Schwab and TD Ameritrade secured and paid on their clients' sweep accounts were unreasonably low when considered in light of prevailing interest rates and business and economic conditions. It further provides an indication of the divergence between the rates paid in the TD Sweep Program and those "available to depositors making deposits directly with the Program Banks."

C.    **The Interest Rates on Sovereign Short-Term Debt Benchmark**

204. The yield on short-term U.S. Treasury Bills also demonstrates that the interest rates paid on Charles Schwab cash sweep accounts were not reasonable and did not properly take into account the market, industry, or prevailing rates or business and economic conditions. Likewise, the U.S. Treasury Bills yield shows that the rates paid on the TD Sweep Program were not fair or reasonable and did not properly consider prevailing market, industry, or prevailing economic and business conditions. U.S. Treasury Bills are short-term securities issued by the U.S. Department of the Treasury with maturities ranging from four to 52 weeks. They

68

are sold at a discount to their face value, and when they mature, the investor is paid the face value.  Treasury Bills are considered extremely safe investments, but they generally do not produce high returns over time, especially in a low-interest-rate environment.

205.  The yield on a U.S. Treasury Bill is the interest rate that the U.S. government pays to borrow money for a set period of time, expressed as a percentage.  As shown in the graph below, over the past several years, the yield on the shortest term (one month) U.S. Treasury Bill: (i) increased through mid-2019; (ii) dropped to close to zero throughout the COVID pandemic; and (iii) steadily increased from close to zero in early 2022 to approximately 5.5% in mid-2023, and remained at approximately that level through August 2024:



206.  During the entire timeframe when the U.S. Treasury Bill yield was appreciably above zero, the interest rates Charles Schwab and TD Ameritrade respectively paid to cash sweep accountholders remained tiny fractions of that benchmark.

69

**D.    The Interest Rate Applicable to Short-Term Instruments Such as Repurchase Agreements**

207.   The prevailing interest rates applicable to short-term instruments such as repurchase agreements from 2020 to the present were also significantly higher than Charles Schwab and TD Ameritrade's respective cash sweep account interest rates.  This further demonstrates that the interest rates paid on Charles Schwab cash sweep accounts were not "reasonable," did not approximate the rates achieved through arm's-length negotiations, and did not reflect prevailing market and business conditions.  Similarly, the interest rates paid on TD Ameritrade cash sweep accounts were not fair or reasonable and did not take into account prevailing market and economic conditions.

208.   A repurchase agreement (also known as a "repo") is a short-term lending instrument that involves the sale and repurchase of securities.  In a repo, a borrower sells a security to a lender, usually a bank or securities dealer, and agrees to buy it back at a specified date and price.  The price is typically higher than the original sale price, reflecting the interest charge for borrowing over the period.  The security serves as collateral for the lender.  A repo can be based on any security, but it usually involves government debt or other debt instruments with steady values.

209.   The overnight repo rate is the interest rate at which different market participants swap treasuries for cash to cover short-term cash needs.  From April of 2023 through April of 2024, for example, the overnight repo rate in the United States ranged from approximately 4.83% in April 2023 to as high as 5.55% in December 2023.  These rates are significantly higher than the respective cash sweep interest rates offered by Charles Schwab and TD Ameritrade.

210.   Through its near complete control and discretion of the investment of client funds in the respective Cash Sweep Programs, Charles Schwab and TD Ameritrade violated their contractual and fiduciary obligations in recommending

70

and placing clients in vehicles that were contrary to their best interests—and solely in the best interests of Charles Schwab and TD Ameritrade.

### E.   The Interest Rate Paid on the Schwab Intelligent Portfolio

211.   Charles Schwab has a "robo-advisor" product called Schwab Intelligent Portfolios ("SIP"). A robo-advisor is a digital platform that provides automated, algorithm-driven financial planning and investment services with little to no human supervision and the SIP provides automated, software-based investment portfolio management to clients.

212.   The SIP has historically swept a large percentage of clients' assets into the Schwab Intelligent Portfolios Sweep Program.  In June of 2022, the SEC entered an Order against Charles Schwab & Co., Inc. Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 and Section 15(b) of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order, related to Schwab's SIP (the "SIP Order").  In the SIP Order, the SEC found that Schwab management decided that the SIP portfolios would collectively hold an average of at least 12.5% of their assets in cash. To meet that goal, management set the exact amount of cash in each of SIP's model portfolios, with the most aggressive portfolio containing 6% cash and the most conservative portfolio 29.4%, based in large part on its analysis that Schwab Bank would make a minimum amount of revenue at these levels.

213.   Charles Schwab does not charge an advisory fee on the SIP. Instead, Charles Schwab obtains revenue from the SIP based on the spread between interest paid to clients and the income it generates from the cash.  Charles Schwab generates such revenue while paying a ***much higher*** interest rate on the SIP cash sweep balances than on clients' non-SIP cash sweep balances.  As of May 2025, the interest rate paid in the SIP Cash Sweep Program was 3.93%, or ***78 times higher*** than the 0.05% interest rate paid on the non-SIP Cash Sweep Programs as of May 2025.

71

**F.    Charles Schwab and TD Ameritrade Breached the Implied Covenant of Good Faith and Fair Dealing to Provide Their Clients with a Reasonable Rate of Interest**

214.    Charles Schwab and TD Ameritrade's client agreements all include an implied covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing requires Charles Schwab and TD Ameritrade to deal fairly with their clients, to fulfill their obligations under the contract in good faith, and to not deprive Class members of the benefit of their bargain.

215.    With respect to Charles Schwab, that implied covenant included a duty for Charles Schwab to consider prevailing interest rates, such that its clients would obtain a fair and reasonable rate of interest on their cash sweep balances, and not to retain for itself and its affiliates the fruits of the contract governing the Cash Sweep Programs.

216.    With respect to TD Ameritrade, that implied covenant included a duty for TD Ameritrade to consider prevailing business and economic conditions in good faith, such that its clients would obtain a fair and reasonable rate of interest on their cash sweep balances, consistent with TD Ameritrade's contractual language stating that the interest rates paid on cash sweep balances "may be higher or lower than the interest rates available to depositors making deposits directly with the Program Banks."

217.    Even if TD Ameritrade's clients' agreements authorized TD Ameritrade to pay its clients a rate of interest that was less than other alternatives available as sweep options, no language in any of the agreements would have permitted TD Ameritrade to evade the spirit of the bargain by paying a rate of interest that was so low as to be unreasonable in comparison to business, economic, or competitive conditions.

218.    TD Ameritrade's contracts and disclosures provided clients with the reasonable expectation that the interest rates paid through the IDA would reflect

prevailing market conditions. This is particularly true in light of the fact that the income TD Ameritrade generated for itself through the cash sweep program was based on a "marketing fee" tied to the amounts deposited at each Program Bank and that the amount of the fee varied over time—which implied there was a negotiation between TD Ameritrade and the Program Banks about the amount of that fee. Moreover, TD Ameritrade's disclosures made clear that TD Ameritrade would determine the interest rates by reference to "prevailing market and business conditions," and said this explicitly with respect to how TD Ameritrade would set interest rates for the TD Ameritrade Cash option. It was thus entirely contrary to the reasonable expectations of Plaintiffs and the members of the Class that TD Ameritrade—which was supposedly acting as their "agent" in "depositing funds into the IDAs and withdrawing funds from the IDAs" and otherwise acting as their agent in operating the TD Sweep Program—obtained a "marketing fee" from the Program Banks that bore no relation to the interest rates that clients received, prevailing market and business conditions, or to the value of the services TD Ameritrade provided in administering the cash sweep program.

219. In failing to remit to its clients a fair and reasonable rate of interest, Charles Schwab and TD Ameritrade breached the implied covenant of good faith and fair dealing.

## VII. DEFENDANTS' BREACHES ENRICHED CHARLES SCHWAB AND TD AMERITRADE BY BILLIONS OF DOLLARS WHILE CAUSING SUBSTANTIAL DAMAGES TO THE CLASS

220. Charles Schwab, TD Ameritrade, and their affiliates gained significant financial benefits from the cash balances swept into the Cash Sweep Programs and TD Sweep Program through the spread the Program Banks earned on the Cash Sweep Programs and TD Sweep Programs' deposits, the amounts that Charles Schwab and TD Ameritrade received from the banks, and other incentive arrangements with the banks that are based, at least in part, on clients' deposit

73

balances and number of accounts in the Cash Sweep Programs and TD Sweep Program.

221. Charles Schwab's business model relied heavily on using billions of dollars of client sweep account cash annually to invest in higher-yielding assets, which was a practice critical enough that Wolfe Research analysts labeled it a "core KPI [key performance indicator] underpinning the [Charles Schwab] investment case." Charles Schwab's dependence on this revenue stream was further entrenched by the influx of new client cash following its 2020 merger with TD Ameritrade.

222. Charles Schwab's strategy inordinately affected less financially savvy clients, particularly households with under $250,000 in assets, who account for approximately 80% of Charles Schwab's clients and a majority of its retail cash deposits. Charles Schwab management has admitted it sees little incentive to offer competitive rates to these clients. For instance, on an investor conference call in 2022, CFO Peter Crawford stated "you're not going to see us change our sweep deposit pricing philosophy to catch up [to interest rates offered by competitors] or to influence client behavior." Research indicates that "most retail investors aren't focused on their cash sweep rates," enabling Charles Schwab to quietly exploit those least-equipped to navigate complex financial arrangements. This pricing approach demonstrates Charles Schwab's systematic prioritization of profit over client welfare.

223. The revenue that Charles Schwab reaped from cash sweep account deposits was a key profit center for the company, and Charles Schwab's unreasonably low cash sweep rates enabled it and its affiliates to reap an extraordinary financial windfall from the spread that Charles Schwab earned on Cash Sweep Program deposits. Indeed, Charles Schwab's net interest income increased dramatically over the past several years as interest rates spiked and remained at elevated levels. Between 2018 and 2024, the net interest revenue for Charles Schwab grew 56.9% from $5.8 billion in 2018 to $9.1 billion in 2024—in

substantial part due to the net interest revenue Charles Schwab generated from its clients' cash sweep deposits.

224.    In connection with net interest revenue, Charles Schwab has disclosed that:

> Net interest revenue is the difference between interest generated on interest-earning assets and interest paid on funding sources. ***Schwab's primary funding source for interest-earning assets is uninvested client cash balances held on our balance sheet as part of clients' overall relationship with the Company***.  Schwab's interest-earning assets are primarily comprised of high-quality fixed income securities, margin loans, and bank loans.

225.    Charles Schwab also repeatedly emphasized the importance of the Cash Sweep Programs in its SEC filings.  For example, Schwab repeatedly disclosed that:

> We rely heavily on bank deposits as a low cost source of funding to extend loans to clients and purchase investment securities. ***Our bank deposits are primarily driven by our bank sweep feature*** when cash awaiting investment in our client brokerage accounts is swept to our banking subsidiaries.  A significant reduction in our clients' allocation to cash, a change in the allocation of that cash, or a transfer of cash away from the Company, could reduce net interest revenue.

226.    Schwab also repeatedly disclosed in its SEC filings that:

> Because we establish the rates paid on certain brokerage client cash balances and bank deposits and the rates charged on certain margin and bank loans, and control the composition of our investment securities, ***we have some ability to manage our net interest spread***, depending on competitive factors and market conditions.

227.    In addition, Schwab repeatedly disclosed that:

> Schwab's primary source of funds is cash generated by client activity which includes bank deposits and cash balances in client brokerage accounts. These funds are used to purchase investment securities and extend loans to clients.

228.    Over the years, net interest revenue represented approximately half of Schwab's total net revenue:

75

2024: 47%
2023: 50%
2022: 51%
2021: 43%
2020: 52%
2019: 61%
2018: 57%

229. Charles Schwab continues to benefit from the difference between the net interest it earns on cash sweep account deposits and the paltry interest it pays out to its clients. This difference is called net interest margin. For instance, in late 2024, Charles Schwab drastically reduced its sweep yield from 0.45% to a negligible 0.05%, slashing client earnings on cash sweep deposits by approximately 89%. In April 2025, William Blair analysts attributed Charles Schwab's increased net interest margin directly to this client rate cut, underscoring the company's ongoing willingness to exploit client funds for Charles Schwab's own financial gains.

230. Likewise, TD Ameritrade established, implemented, and maintained the TD Sweep Program to maximize its profits by securing for its clients unfair and unreasonably low interest rates while appropriating almost all of the interest earned at significantly higher rates for itself. TD Ameritrade's breaches of its contractual agreements and the corresponding implied covenant to pay its clients a fair and reasonable rate of interest improperly enriched TD Ameritrade.

231. TD Ameritrade and its affiliates reaped an extraordinary financial windfall from the cash balances swept into its TD Sweep Program Indeed, TD Ameritrade's bank deposit account ("BDA") fees—which represented the revenue TD Ameritrade generated from the TD Sweep Program—increased dramatically from 2017 to 2019 (the last three full years of TD Ameritrade's existence prior to its acquisition by Charles Schwab) as interest rates rose. Specifically, between 2017 and 2019, BDA fees grew 55.1% from $1.1 billion to $1.7 billion. As TD Ameritrade disclosed, the "average yield" on BDA balances increased by "benefiting from the federal funds net rate increases during fiscal years 2018 and 2019."

232.  TD Ameritrade further disclosed:

Bank deposit account fees, generated from the IDA agreement and other *sweep arrangements with non-affiliated third-party depository financial institutions, account for a significant percentage of our net revenues (29% of our net revenues for the fiscal year ended September 30, 2019).* These sweep arrangements enable our clients to invest in FDIC-insured (up to specified limits) deposit products without the need for the Company to establish the significant levels of capital that would be required to maintain our own bank charter.

233.  BDA fees were of great importance to TD Ameritrade, representing approximately one-third of TD Ameritrade's total net revenue from 2017 through 2019, i.e., the years leading up to the acquisition by Charles Schwab.  Naturally, the BDA fees generated by the TD Sweep Program provided billions of dollars in net revenue to Charles Schwab following the acquisition.  Specifically, Charles Schwab has reported that the BDA fees it earned through the TD Ameritrade cash sweep assets it acquired totaled over $4.5 billion from the close of the TD Ameritrade acquisition through the end of 2024.

234.  In fact, even after transitioning $32 billion of BDA balances to Charles Schwab's balance sheet from 2021 to 2022, the revenues Charles Schwab collected from TD Ameritrade cash sweep balance "fees" continued to grow over the course of 2023 and 2024 even though the average cash sweep balances declined substantially over this same time period—generating $729 million in revenues in 2024 alone.  And these amounts do not include the substantial benefit obtained through the transfer of TD Ameritrade cash sweep balances to Charles Schwab's balance sheet, which analysts estimated presented the opportunity for incremental revenues for Charles Schwab of $1.4 billion on top of the BDA fees.

235.  Further, TD Ameritrade's automatic enrollment of clients in its TD Sweep Program—which, as of 2023, swept clients' cash solely to its Affiliated Banks instead of unaffiliated, third-party banks—violated TD Ameritrade's contractual and other fiduciary and other duties under Reg. BI to act in its client's

best interest and not put TD Ameritrade's interest ahead of the client's. By automatically enrolling its clients in the TD Sweep Program, sweeping its clients' cash to its Affiliated Banks, paying its clients unreasonably low interest rates, and reaping net interest income, TD Ameritrade took advantage of this inherent conflict and failed to act in its clients' best interests.

236. The relationships between Charles Schwab and TD Ameritrade and their respective clients, the imbalance of negotiating power between Charles Schwab and TD Ameritrade and their respective clients, and Charles Schwab and TD Ameritrade's respective exercise of control over the respective interest rates paid in the Cash Sweep Programs and TD Sweep Program are circumstances that create equitable obligations (in addition to any fiduciary, contractual or implied duty) running from Charles Schwab and TD Ameritrade to their clients.

237. Charles Schwab and TD Ameritrade's continual sweep of Plaintiffs' and the other Class members' cash into the Cash Sweep Programs and TD Sweep Program, while paying them unreasonably low interest rates, constitutes a continuing wrong and was an ongoing and continuing series of breaches of Charles Schwab and TD Ameritrade's duties to, and contracts with, Plaintiffs and the other Class members.

## **CLASS ACTION ALLEGATIONS**

238. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

239. Plaintiffs seek certification of the following Class:

**Clients of Charles Schwab who had cash deposits or balances in Charles Schwab Cash Sweep Programs from August 29, 2020 until the unlawful conduct alleged herein ceases**.

240. Plaintiffs also seek certification of the following Subclasses:

**Clients of Charles Schwab who held an Individual Retirement Account with Charles Schwab and had cash deposits or balances in**

78

**Charles Schwab Cash Sweep Programs from August 29, 2020 until the unlawful conduct alleged herein ceases (the "Schwab IRA Subclass").**

241.   Plaintiffs also seek certification of the following additional Subclasses:

**Clients of TD Ameritrade who had cash deposits or balances in the TD Ameritrade IDA Program from August 29, 2019 until transitioned to the Charles Schwab Cash Sweep Programs (the "TD Ameritrade IDA Subclass").**

**Clients of TD Ameritrade who held an Individual Retirement Account with TD Ameritrade and had cash deposits or balances in the TD Ameritrade IDA from August 29, 2019 until transitioned to Charles Schwab Cash Sweep Programs (the "TD Ameritrade IRA Subclass" and, together with the Schwab IRA Subclass, the "IRA Subclass").**

242.   Plaintiffs reserve the right to amend the Class and IRA Subclass definitions if further investigation and discovery indicates that such definitions should be narrowed, expanded, or otherwise modified.

243.   Excluded from the Class are Charles Schwab and any of its affiliates, legal representatives, employees, or officers; the judicial officer(s) and any judicial staff overseeing this litigation; and counsel for Plaintiffs and the proposed Class.

244.   This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

**Numerosity
Rule 23(a)(1)**

245.   Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this time.   However, Charles Schwab provides financial planning and advisory services to thousands of client accounts through the work of over 15,000 financial advisors.   Accordingly, Plaintiffs and the Class satisfy the

79

numerosity requirement of Rule 23. Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

**Existence and Predominance of**
**Common Questions of Law and Fact**
**Rule 23(a)(2), 23(b)(3)**

246. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

a. whether interest rates paid on Defendants' sweep accounts were fair and reasonable;

b. whether in setting interest rates to be paid in its sweep accounts Defendants reasonably or properly accounted for prevailing economic, market and business conditions, including interest rates at other or similar financial services firms;

c. whether Defendants had policies and procedures designed to pay a reasonable rate of interest;

d. whether Defendants had policies and procedures concerning the allocation of client funds in the Programs that were designed to take into account the best interests of the clients;

e. whether Defendants owed fiduciary duties and other duties of care to the members of the Class, and whether Defendants violated those duties;

f. whether Defendants acted as their clients' agent in the management and complete control over the Cash Sweep Programs and TD Sweep Program;

g. whether Defendants breached the contractual terms of their account agreements and other written communications to Class members;

h.    whether Defendants retained for themselves and their affiliates excessive fees and financial benefits from the interest generated by their clients' cash in the Cash Sweep Programs and TD Sweep Program;

i.    whether Defendants breached the implied covenant of good faith and fair dealing;

j.    whether Defendants were unjustly enriched by their wrongful conduct;

k.    whether this case may be maintained as a class action under Fed. R. Civ. P. 23;

l.    whether and to what extent Class members are entitled to damages and other monetary relief; and

m.    whether and to what extent Class members are entitled to attorneys' fees and costs.

247.    The client agreements contain a choice of law provision that provides, in relevant part, that they and their enforcement shall be governed by the laws of California (for Charles Schwab accounts) or Nebraska (for TD Ameritrade accounts).    As a result, California law applies to Class members who opened accounts with Charles Schwab or had their accounts transitioned to Charles Schwab, and Nebraska law applies to the extent that any Class members' accounts with TD Ameritrade were closed prior to the transition.

**Typicality**
**Rule 23(a)(3)**

248.    Plaintiffs' claims are typical of the claims of the Class because they were accountholders with Charles Schwab that were paid unreasonably low interest rates in their cash sweep accounts that did not follow policies and procedures designed to pay a reasonable rate of interest based on prevailing interest rates at other or similar financial services firms.    Thus, Plaintiffs' claims are typical of the claims of the Class members as they arise from the same course of conduct by Defendants, and the relief sought within the Class is common to the Class members.

81

**Adequacy of Representation**
**Rule 23(a)(4)**

249. Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

**Superiority**
**Rule 23(b)(3)**

250. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

251. Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

252. Superiority is particularly satisfied here, where the law of a single state will apply. Under the uniform contract terms with Defendants, the law of California (for Charles Schwab accounts) or Nebraska (for non-transitioned TD Ameritrade accounts) will apply to each Class member's claims, allowing the Court to adjudicate the claims of all Class members under a single state analysis.

253. Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## FIRST CLAIM FOR RELIEF

**Breach of Contract**
**Brought on Behalf of Plaintiffs and the Class**
**Against All Defendants**

254. Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against all Defendants.

255. Defendants' governing documents related to the Cash Sweep Programs and TD Sweep Program constitute a binding agreement between Defendants and their accountholders, the members of the Class. For example, the Charles Schwab agreements and disclosures state that "[y]ou agree that the Agreement and Disclosures govern all aspects of your relationship with Schwab, including all

transactions between Schwab and you and all products and services now or in the future offered through Schwab."

256. The governing documents provide that Defendants will pay to, or secure for, their clients a rate of interest on cash deposits or balances maintained in the cash sweep programs that is based on prevailing market and business conditions or otherwise reasonable. In addition, the governing documents provide that Defendants will pay Cash Sweep Program retirement accountholders a "reasonable rate of interest" and will act as a fiduciary to TD Sweep Program retirement accountholders.

257. In both the governing documents between Class members and Charles Schwab Defendants and the TD Ameritrade Defendants, respectively, Defendants further agreed to act as an "agent" for Plaintiffs and the members of the Class in establishing, maintaining, and managing the Cash Sweep Programs and TD Sweep Program.

258. Defendants further promised that when Charles Schwab and TD Ameritrade acts as a broker-dealer, it has a "duty to act in its client's best interest," including in connection with cash in the Cash Sweep Programs and TD Sweep Program, and when acting as investment adviser to "avoid serving their own personal interests ahead of clients," and to "avoid, and, where appropriate, mitigate any actual or potential conflicts of interest or any abuse of their position of trust and responsibility."

259. As set forth herein, Defendants failed to pay to, or secure for, Plaintiffs and Class members a fair or reasonable interest rate on their Cash Sweep Program and TD Sweep Program holdings that was based on prevailing interest rates at other or similar financial services firms and prevailing market and business conditions, failed to have policies and procedures designed to pay a reasonable rate of interest, and Defendants thereby breached the contracts.

260. Defendants' past, continuous, and ongoing breaches damaged and continue to damage Plaintiffs and the Class.

## SECOND CLAIM FOR RELIEF

**Breach of Contract**
**Brought on Behalf of the IRA Subclasses**
**Against All Defendants**

261. Plaintiffs, on behalf of themselves and the IRA Subclasses, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against all Defendants.

262. Defendants' governing documents related to accounts held by the IRA Subclasses constitute a binding agreement between Defendants and their accountholders. Specifically, the governing documents include, among others, the Cash Features Program Disclosure Statements for Charles Schwab clients and the Client Agreement for the Institutional Division of TD Ameritrade for TD Ameritrade clients.

263. Defendants' governing documents related to their accounts constitute a binding agreement with those accountholders.

264. The governing documents for the Cash Sweep Programs provide that for any retirement account assets that are invested in deposits of the Program Banks, Defendants will secure for and pay to the IRA Subclasses a reasonable rate of interest, in accordance with Section 4975 of the Internal Revenue Code, and that TD Ameritrade acts as a fiduciary for any retirement account assets.

265. In addition, by operation of law through their management and discretion over IRA retirement assets, Defendants and the banks where IRS Subclass members' retirement cash sweep assets were held became obligated to comply with provisions of the IRC obligating the payment of a "reasonable interest rate."

85

266.  As set forth herein, Defendants failed to pay to, or secure for, Plaintiffs and the Subclass members a reasonable interest rate on their Cash Sweep Program and TD Sweep Program holdings and Defendants thereby breached the contracts.

267.  Defendants' past, continuous, and ongoing breaches damaged and continue to damage Plaintiffs and the Subclass.

## THIRD CLAIM FOR RELIEF

### Breach of the Implied Covenant of Good Faith and Fair Dealing Brought on Behalf of Plaintiffs and the Class Against All Defendants

268.  Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against all Defendants.

269.  Defendants' governing documents related to class members' accounts constitute a binding agreement with those accountholders.

270.  Implicit in these contracts (all of which incorporated Defendants' Cash Sweep Program and TD Sweep Program disclosure documents), and under state law which governs them, is a covenant of good faith and fair dealing, requiring Defendants to deal fairly with their clients, to fulfill their obligations under the contract in good faith, and to not deprive Class members of the fruits of their bargain.

271.  To the extent that Defendants were afforded discretion by the contractual agreements to pay interest rates "consistent with their views of prevailing market and business conditions," to secure for and pay the IRA Subclass members a "reasonable" rate of interest, and to set the interest paid through the Cash Sweep Programs and TD Sweep Program, Defendants breached the implied covenant of good faith and fair dealing by exercising that discretion arbitrarily, irrationally, or otherwise in bad faith through the conduct alleged herein. Defendants' past, continuous, and ongoing breaches of the implied covenant damaged and continue to damage Plaintiffs and the Class.

86

## <u>FOURTH CLAIM FOR RELIEF</u>

**Breach of Fiduciary Duty**
**Brought on Behalf of Plaintiffs and the Class**
**Against All Defendants**

272.  Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against all Defendants.

273.  Defendants owed fiduciary duties to Plaintiffs and Class members with respect to the Cash Sweep Programs and TD Sweep Program.

274.  These duties include, but are not limited to:

a.    a duty of care;

b.    a duty of loyalty;

c.    a duty to act in the best interests of its clients; and

d.    a duty not to place Defendants' interests and the interests of their affiliates above those of their clients.

275.  Defendants breached the foregoing duties when they (i) failed to pay to or secure for Plaintiffs and the Class a fair or reasonable rate of interest that properly took into account prevailing market and business conditions including interest rates at other or similar financial services firms; (ii) failed to act in the best interests of Plaintiffs and the Class with respect to the Cash Sweep Programs and TD Sweep Program, including by failing to implement reasonably designed policies and procedures concerning the allocation of client funds in the Cash Sweep Programs and TD Sweep Program; and (iii) recommending that Plaintiffs and the Class utilize and continue to utilize the Cash Sweep Programs and TD Sweep Program.

276.  Defendants' past, continuous, and ongoing breaches of duties damaged Plaintiffs and the Class.

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment
### Brought on Behalf of Plaintiffs and the Class
### Against All Defendants

277. Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against all Defendants in the alternative to the preceding Claims to the extent it is duplicative of any such claim.

278. As a result of Defendants' wrongful conduct, Plaintiffs and the Class received unfair and unreasonably low interest payments on their cash sweep deposits.

279. As a result of Defendants' wrongful conduct, Defendants were unjustly enriched because, among other benefits, they received revenues, net interest income, and other financial benefits than they would have but for their wrongful conduct.

280. Defendants appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and the Class.

281. It would be inequitable and unjust for Defendants to retain these wrongfully obtained financial benefits.

282. Defendants' retention of these unjustly obtained benefits would violate the fundamental principles of justice, equity, and good conscience.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class (including the TD Ameritrade IDA and IRA Subclasses), demand judgment and relief as follows:

   a.    certifying the proposed Class and the TD Ameritrade IDA and IRA Subclasses, and appointing Plaintiffs and their counsel to represent the proposed Class and TD Ameritrade IDA and IRA Subclasses;

88

b.   awarding Plaintiffs and Class members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

c.   awarding Plaintiffs and Class members equitable relief in the form of restitution in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

d.   awarding Plaintiffs and Class members restitution, disgorgement of profits, and forfeiture of compensation;

e.   awarding Plaintiffs and the Class reasonable attorneys' fees and costs of suit, including expert witness fees; and

f.   awarding such other and further relief as the Court deems proper.

## JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and the Class (including the TD Ameritrade IDA and IRA Subclasses), demand a trial by jury on all issues so triable.

Dated: May 23, 2025                    Respectfully submitted,

*/s/ Jonathan D. Uslaner*

Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Salvatore J. Graziano (*pro hac vice*)
salvatore@blbglaw.com
John Rizio-Hamilton (*pro hac vice*)
johnr@blbglaw.com
Avi Josefson (*pro hac vice*)
avi@blbglaw.com
Adam H. Wierzbowski (*pro hac vice*)
adam@blbglaw.com

89

Michael D. Blatchley (*pro hac vice*)
michaelb@blbglaw.com
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400

Thomas I. Sheridan, III (*pro hac vice*)
tsheridan@simmonsfirm.com
Sona R. Shah (*pro hac vice*)
sshah@simmonsfirm.com
**SIMMONS HANLY CONROY LLP**
112 Madison Avenue
New York, NY 10016
Telephone: (212) 784-6404

Alan L. Rosca (*pro hac vice*)
arosca@rscounsel.law
**ROSCA SCARLATO LLC**
2000 Auburn Dr. Suite 200
Beachwood, OH 44122
Telephone: (216) 946-7070

Paul J. Scarlato (*pro hac vice*)
pscarlato@rscounsel.law
**ROSCA SCARLATO LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400Conshohocken, PA 19428
Telephone: (216) 946-7070

*Counsel for Consolidated Plaintiffs Mary Loughran, Rosemary Orlando, Edward Carr, Donald Saunders, Michael Davis, and Terrance "TJ" McDonald and Interim Class Counsel*

90